# EXHIBIT W

Ex. W - Part One

DHS-001-HQLI-00031-000001 - 000055;

DHS-001-2445-000056 - 000400

| From: | Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   > |
|---|---|
| To: | "Clark, Alaina </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   >"; "Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   >"; "Carroll, Kevin T. </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   ; "Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   >" |
| CC: | "Maher, Joseph </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)   )/CN=RECIPIENTS/CN=(b)(6)   >" |
| Subject: | RE: U.S. arrests Mexican immigrant in Seattle covered by Obama program |
| Date: | 2017/02/14 21:34:56 |
| Priority: | Normal |
| Type: | Note |

Here's the background (caution, contains some PII)

BACKGROUND:



**From:** Clark, Alaina
**Sent:** Tuesday, February 14, 2017 9:32:53 PM

**To:** Nielsen, Kirstjen; Carroll, Kevin T.; Metzler, Alan; Lapan, David
**Cc:** Maher, Joseph
**Subject:** RE: U.S. arrests Mexican immigrant in Seattle covered by Obama program

We just went back w what David provided

**From:** Nielsen, Kirstjen
**Sent:** Tuesday, February 14, 2017 9:31:44 PM
**To:** Carroll, Kevin T.; Metzler, Alan; Lapan, David
**Cc:** Maher, Joseph; Clark, Alaina
**Subject:** RE: U.S. arrests Mexican immigrant in Seattle covered by Obama program

We have the facts
Alaina have you shared?

**From:** Carroll, Kevin T.
**Sent:** Tuesday, February 14, 2017 9:11:40 PM
**To:** Nielsen, Kirstjen; Metzler, Alan; Lapan, David
**Cc:** Maher, Joseph; Clark, Alaina
**Subject:** FW: U.S. arrests Mexican immigrant in Seattle covered by Obama program

Just FYI -- the governor of Washington thinks we're arresting Dreamers willy-nilly.

Kevin Carroll
Senior advisor, DHS OGC
Desk: (b)(6)
Cell:

**From:** Clark, Alaina
**Sent:** Tuesday, February 14, 2017 9:08:15 PM
**To:** Carroll, Kevin T.
**Subject:** RE: U.S. arrests Mexican immigrant in Seattle covered by Obama program

There's a chain w Mayer on it- waiting for cleared language- (b)(5)
(b)(5)

Let me have Taylor respond and say "we're checking"

**From:** Carroll, Kevin T.
**Sent:** Tuesday, February 14, 2017 9:06:32 PM
**To:** Clark, Alaina
**Subject:** RE: U.S. arrests Mexican immigrant in Seattle covered by Obama program

I don't see how we can help him too much in the middle of litigation, unfortunately.

That said, let's see what ICE may know ....

Kevin Carroll
Senior advisor, DHS OGC
Desk: (b)(6)
Cell:

**From:** Ricketts, Sam (GOV)
**Sent:** Tuesday, February 14, 2017 9:03:57 PM
**To:** Price, Taylor; Clark, Alaina; Hyer, Brian; Carroll, Kevin T.
**Subject:** Re: U.S. arrests Mexican immigrant in Seattle covered by Obama program

Hello again - copying Kevin, as well, and hoping someone will respond. We need answers to questions tonight.

Why was this individual picked up by ICE and taken into custody, when he had registered under the DACA program?

President Trump has signaled no change or intention to change the DACA program.

Can we expect ICE to detain additional DACA program participants?

Again, I am expecting a response today.

Thanks

-Sam

On Feb 14, 2017, at 8:23 PM, Ricketts, Sam (GOV) <(b)(6)
wrote:

Alaina, Taylor - Governor Inslee is very concerned about this news. Can you please put me in touch with ICE staff, preferably local or regional leadership, who can answer questions that we have? I hope to talk to them this evening. Thanks

Sam Ricketts
Director, Washington, DC Office
Office of Governor Jay Inslee


http://mobile.reuters.com/article/idUSKBN15T307

Exclusive: U.S. arrests Mexican immigrant in Seattle covered by Obama

program
<image001.jpg>
U.S. Immigration and Customs Enforcement (ICE) officers conduct a targeted enforcement operation in Atlanta, Georgia, U.S. on February 9, 2017. Courtesy Bryan Cox/U.S. Immigration and Customs Enforcement via REUTERS

By Daniel Levine and Kristina Cooke | SAN FRANCISCO

U.S. authorities have arrested an immigrant from Mexico who was brought to the United States illegally as a child and later given a work permit during the Obama administration in what could be the first detention of its kind under President Donald Trump.

Daniel Ramirez Medina, a 23-year-old with no criminal record, was taken into custody last week at his father's home in Seattle by U.S. Immigration and Customs Enforcement officers. The officers arrived at the home to arrest the man's father, though court documents did no make clear the reason the father was taken into custody.

Ramirez, now in custody in Tacoma, Washington, was granted temporary permission to live and work legally in the United States under a program called the Deferred Action for Childhood Arrivals, or DACA, established in 2012 by Democratic President Obama, according to a court filing.

The program protects from deportation 750,000 people who were brought to the United States illegally as children, sometimes called the

DHS-001-HQLI-00031-000004

"dreamers," and gives them the temporary right to work legally in the United States.

Trump, a Republican who took office on Jan. 20, has promised a crackdown on the estimated 11 million illegal immigrants in the United States, most of whom come from Mexico and other Latin American countries. A move against DACA recipients like Ramirez would represent a significant broadening of immigration enforcement under Trump.

Ramirez filed a challenge to his detention in Seattle federal court on Monday, arguing that the government violated his constitutional rights because he had work authorization under the DACA program.

Ethan Dettmer, a partner in the law firm Gibson Dunn & Crutcher who is one of the lawyers representing Ramirez, said he is not aware of any other DACA recipient who has been arrested.

"We are hoping this detention was a mistake," Dettmer said.

A BROKEN PROMISE?

Another one of his lawyers, Mark Rosenbaum of the legal advocacy group Public Counsel, characterized the DACA program as a promise from the federal government's executive branch that DACA recipients would not be targeted for deportation.

"We have no reason to believe that promise will be broken. This case should not see the inside of a courtroom," Rosenbaum said.

Ramirez was in custody and unavailable for comment. Representatives for Immigration and Customs Enforcement declined immediate comment on the lawsuit.

Emily Langley, a spokeswoman for the U.S. attorney's office in Seattle, said the Justice Department is still reviewing the case.

U.S. immigration officers last week arrested more than 680 people in the country illegally. Department of Homeland Security Secretary John Kelly said the operations, conducted in at least a dozen states, were routine and consistent with regular  operations. But immigrant advocacy groups and Democrats have expressed concern that the Trump administration will escalate immigration enforcement efforts in line with the president's tough stance toward illegal immigrants.

Trump campaigned on a promise to roll back Obama's executive actions on immigration, but since assuming office he has kept his public comments on DACA vague.

In an interview with ABC News last month, Trump said his administration was devising a policy on how to deal with people covered by DACA. "They are here illegally. They shouldn't be very worried. I do have a big heart. We're going to take care  of everybody. We're going to have a very strong border," Trump said at the time.

Under DACA, the government collected information including participants' addresses that potentially could be used to locate and deport them if the program is reversed.

Ramirez was brought to the United States from Mexico in about 2001 at about age 7, according to the lawsuit. The government granted him a DACA card in 2014 and renewed it in 2016, finding that he was no threat to public safety. He has a 3-year-old  son, according to the complaint.

Ramirez in his lawsuit is seeking his immediate release and an injunction forbidding the government from arresting him again. A hearing in the case has been scheduled for Friday.

According to the lawsuit, Ramirez was asleep at his father's home last Friday morning when ICE agents arrived and arrested the father. When they entered, they asked Ramirez if he was in the country legally, and Ramirez said he had a work permit,  the lawsuit stated.

ICE agents took Ramirez to a processing center in Seattle and he again disclosed his DACA work permit, the lawsuit stated.

"It doesn't matter, because you weren't born in this country," one of the agents said, according to the lawsuit.

Ramirez was fingerprinted, booked and taken to a detention center in Tacoma where he was still in custody on Tuesday, Rosenbaum said.

(Additional reporting by Bill Rigby in Seattle; Editing by Sue Horton and Will Dunham)

| Sender: | Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=(b)(6) > |
|---|---|
| Recipient: | "Clark, Alaina </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=(b)(6) >"; "Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=(b)(6) >"; "Carroll, Kevin T. </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=(b)(6) >"; "Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=(b)(6) >"; "Maher, Joseph </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN(b)(6) |
| Sent Date: | 2017/02/14 21:34:53 |
| Delivered Date: | 2017/02/14 21:34:56 |

**Talking Points for Opening Remarks**
**Council of Governor's Winter Plenary Meeting**
**Washington, DC**
**February 24, 2017**

**Background:** You will give 2-3 minutes of introductory remarks at the opening of the Council of Governors' winter meeting.  The meeting format is a roundtable discussion.  The group is relatively small—approximately 25 people—comprised of 10 governors; the Council co-chairs; Deputy Secretary of Defense Robert Work; Assistant to the President for Homeland Security and Terrorism, Tom Bossert; and staff members.

You will speak from your seat at the table.  During this first part of the meeting, you will informally introduce yourself and express how much you're looking forward to working with this group.  The objective is introductory rapport building.

- I'd like to start by expressing my sympathy for the loss of Justin Stevens[1].  I understand that his work with the Council on behalf of the states was instrumental, and that his presence is deeply missed.

- As the Secretary of Homeland Security, my top priority is protecting the United States and its citizens.

- This is my first meeting with this group, and I'm looking forward to learning from you.

- I want to hear about the challenges you're facing, and discuss how we can work together.

- I'm proud of the work DHS has done with the Council, especially with regard to cybersecurity.

  - The Joint Action Plan for cybersecurity has helped us make tremendous progress at the state and federal level.

---

[1] Justin Stevens was Legislative Director at the National Governors Association.  He recently passed away from cancer.  https://www.congress.gov/crec/2017/02/01/modified/CREC-2017-02-01-pt1-PgS590.htm

- ▪ DHS completed all 19 of its tasks in the Joint Action Plan.

    - o The Department is also working closely with the Council on the Cyber Incident Plan, and we look forward to finalizing it with the states soon.

- I appreciate your time and interest in these critical issues of national security.

**Talking Points for Featured Discussion**
**Council of Governor's Winter Plenary Meeting**
**Department of Homeland Security Strategic Vision and Priorities**
**Washington, DC**
**February 24, 2017**

---

**Background:** You will give approximately 10 minutes of remarks during the Council of Governors' winter meeting. This is a time for you to discuss the Department's strategic vision and priorities. You will speak after Mr. Tom Bossert, Assistant to the President for Homeland Security and Terrorism. Deputy Secretary of Defense Robert Work will speak after you. After Deputy Secretary Work's remarks, there will be an open dialogue involving all members of the Council.

The group is relatively small—approximately 25 people—comprised of 10 governors; the Council co-chairs; Deputy Secretary of Defense Robert Work; Assistant to the President for Homeland Security and Terrorism, Tom Bossert; and staff members.

You will speak from your seat at the table.

---

- **Partnerships are important.**

  - Discuss recent travel to Munich and relationship with international allies.

  - Discuss recent travel to Mexico and Guatemala.

  - Discuss experience with international partnerships in command of SOUTHCOM.

  - The Department's relationship with the states is critical, because these states make up the homeland we protect.

  - I thank the Council for their commitment to homeland security.

- **Securing our nation means enforcing our laws. The Department of Homeland Security has a law enforcement mission.**

  o President Trump's Executive Orders on border security and immigration enforcement improvements directs DHS to:

    ▪ deploy all lawful means to secure our nation's southwest border;

    ▪ prevent further illegal immigration into the United States; and

    ▪ repatriate illegal aliens swiftly, consistently, and humanely.

  o This includes establishing operational control of the border, and controlling a physical barrier. The latter, I plan to do with recommendations by our experts, the men and women on the front lines.

- **In the interest of our nation's security, and in implementation of the Executive Order, we are also detaining aliens and ending the practice of "catch and release" law enforcement; and returning illegal aliens to their countries of origin, pending formal legal proceedings.**

- **U.S. Immigration and Customs Enforcement has launched a series of targeted enforcement operations across the country.**

  - These operations targeted public safety threats, such as convicted criminal aliens and gang members.

  - It also included individuals who have violated our immigration laws, with a specific focus on those who illegally re-entered the country after they were ordered removed by federal immigration judges.

- In support of that mission, our Department has focused on removing illegal aliens who have violated immigration laws, with a focus on those who pose a threat to public safety, have been charged with criminal offenses, or have been deported and re-entered the country illegally—demonstrating a deep disregard for our nation and its laws.

- **Some have raised questions about our enforcement operations with respect to Dreamers, the DACA recipients.**

  - Under DHS policy, aliens granted deferred action from deportation who are subsequently found to pose a threat to national security or public safety may have their deferred action terminated at any time.

  - DHS may also seek their removal from the United States. This includes those who have been arrested or convicted of certain crimes, or those who are associated with criminal gangs.

  - Since the start of the Deferred Action for Childhood Arrivals program in 2012, approximately 1,500 recipients have had their deferred action terminated due to a criminal conviction, gang affiliation, or a criminal conviction related to gang affiliation.

  - These cases illustrate the difficult work ICE fugitive operations teams perform every day across the country to remove public safety threats from our communities when they encounter them.

  - ICE officers, along with their law enforcement partners, have and will continue to enforce our nation's laws to protect public safety, national security, and to preserve the integrity of our immigration system.

- **We want to encourage and facilitate legal trade and travel. That means knowing who travelers are, where they're going, and what they intend to do.**

- Career intelligence professionals tell me we are overdue for a thorough analysis and assessment of our immigration and refugee vetting system.

- **We need a new philosophy, one that accounts for changes in geopolitics—like the collapse of states like Syria—and changes in technology.**
  - We all leave digital footprints in our modern, interconnected world.

  - When we vet someone coming into our country—someone we know nothing about, for whatever reason—we can look at their finances and their electronic trail.

  - We have to get more serious about how we look at people coming into the United States.

- **The Executive Order signed on January 27, 2017, was designed to allow for proper review of our immigration standards, so we could establish policies that would protect the American people.**
  - In accordance with the federal district judge's ruling, DHS has suspended any and all actions implemented with that Executive Order, titled "Protecting the Nation from Foreign Terrorist Entry into the United States."

  - This includes actions to suspend passenger system rules that flag travelers for operational action subject to the EO.

  - DHS personnel have resumed inspecting travelers in accordance with standard policies and procedures.

- **The Executive Order is not—and never was—a "Muslim ban."**

- There are 51 countries on the planet that have predominately Muslim populations.  There were not 51 countries named in the Executive Order.

- The temporary travel pause in the Executive Order named seven countries—countries torn by chaos and civil war, some countries where we don't even have an embassy.

- We must protect Americans and advance our national interests. We must ensure that those entering this country will not harm the American people after we've welcomed them with open arms.

- We must have a functional immigration system that safeguards our people and our homeland.

- **Cybersecurity is also an important part of our homeland security mission.**
  - A threat in the digital world is as serious as a threat in the physical world, especially as the two worlds are increasingly linked.

    **IF EXECUTIVE ORDER IS SIGNED:**

- The Executive Order on cybersecurity takes an important step forward by directing agencies to take particular actions to improve the cybersecurity of Federal Government systems, critical infrastructure, and the entire Nation.

- Ensuring a secure and resilient cyberspace is an important part of our homeland security mission.

- This Executive Order reaffirms the central role of DHS in ongoing cybersecurity efforts and highlights the need to further strengthen existing partnerships with the private sector and across the U.S. Government as we work collectively to

strengthen our cybersecurity and our resilience from malicious cyber activity.

- o The Executive Order builds on the important work that Congress has done to codify DHS roles and responsibilities for cybersecurity.

- o By directing DHS and other agencies to engage with private sector and other nonfederal stakeholders, the Executive Order recognizes the importance of continuing our strong partnerships between government and industry to address shared challenges.

- DHS will work with the Office of Management and Budget and other agencies to ensure that the U.S. Government takes an enterprise-wide approach to security challenges facing the Executive Branch, adequately protect the Executive Branch enterprise, and build a more modern, secure and resilient IT architecture.

- DHS will also build upon existing interagency efforts to support the cybersecurity of critical infrastructure entities and ensure all relevant Government authorities and capabilities are being used to protect critical infrastructure as well as the American people.

- **I look forward to working with the members of the Council to address these serious national concerns.**

- **I would be happy to discuss any of these topics during our open dialogue.**



| From: | Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) ))/CN=RECIPIENTS/CN=(b)(6) > |
|---|---|
| To: | "Christensen, Gillian </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) "Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) "; "Fulghum, Chip </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >"; "Higgins, Jennifer </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >"; "Hamilton, Gene </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) "; "(b)(6) ]</O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >" |
| CC: | "Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >"; "Hoffman, Jonathan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >"; "Burke, Jenny </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >" |
| Subject: | RE: Press Round-Up: Wednesday, February 22, 2017 |
| Date: | 2017/02/22 19:09:27 |
| Priority: | Normal |
| Type: | Note |

Thank you.

**From:** Christensen, Gillian
**Sent:** Wednesday, February 22, 2017 7:09 PM
**To:** Metzler, Alan <(b)(6) >; Nielsen, Kirstjen <(b)(6) >;
Fulghum, Chip <(b)(6) >; Higgins, Jennifer <(b)(6) >;
Hamilton, Gene <(b)(6) >; (b)(6) >
**Cc:** Lapan, David <(b)(6) >; Hoffman, Jonathan <(b)(6) >;
Burke, Jenny <(b)(6) >
**Subject:** RE: Press Round-Up: Wednesday, February 22, 2017

I confirmed the sensitive location policies remain in place and that the grounds for DACA termination have not changed.

**From:** Metzler, Alan
**Sent:** Wednesday, February 22, 2017 7:04:03 PM
**To:** Christensen, Gillian; Nielsen, Kirstjen; Fulghum, Chip; Higgins, Jennifer; Hamilton, Gene; (b)(6)
**Cc:** Lapan, David; Hoffman, Jonathan; Burke, Jenny
**Subject:** RE: Press Round-Up: Wednesday, February 22, 2017

Gillian, what was our comment in response to the NYT inquiry?  Alan

**From:** Christensen, Gillian
**Sent:** Wednesday, February 22, 2017 6:41 PM

**To:** Nielsen, Kirstjen <(b)(6)                        >; Fulghum, Chip <(b)(6)                        >;
Metzler, Alan <(b)(6)                        >; Higgins, Jennifer <(b)(6)                        >; Hamilton,
Gene <(b)(6)                        >; (b)(6)                        >
**Cc:** Lapan, David <(b)(6)                        >; Hoffman, Jonathan <(b)(6)                        >;
Burke, Jenny <(b)(6)                        >
**Subject:** Press Round-Up: Wednesday, February 22, 2017

## Wednesday, February 22, 2017

### HQ

-Secretary Kelly's public remarks in Guatemala drew attention in the U.S. In addition, CNN has mentioned Secretary Tillerson and Secretary Kelly's trip to Mexico as "damage control" with regard to immigration issues.

-Acting Deputy Secretary Chip Fulghum participated in a naturalization ceremony at Mount Vernon. A number of outlets including *Fox News and CBS* covered the event.

-The *LA Times* will run an editorial tomorrow regarding the implementation of Executive Orders 1 and 2. Gene Hamilton provided background.

-The *Wall Street Journal* will run a story tomorrow regarding the build out of the border barrier and what it will look like. The piece will focus on what Secretary Kelly has said in testimony and previous media engagements. Former DHS officials will also be quoted on the record.

-*Telemundo and Univision* requested a DHS statement on the case of an individual who committed suicide by throwing himself off a bridge after being repatriated back to Mexico. OPA provided the below:

### STATEMENT

*DHS is aware of the report of a man named Guadalupe Olivas-Valencia who allegedly jumped off a bridge in Tijuana, Mexico resulting in his death. On February 20, Mr. Olivas presented himself to CBP officers at the San Ysidro port of entry, had no legal documents to enter the U.S., and was found to be inadmissible. He was repatriated to Mexico on February 21, 2017, and turned over to Mexican officials. Out of respect for the family of the deceased, we decline further comment at this time.*

### BACKGROUND

(b)(5)



-In response to reports that that Chicago school administrators have sent out emails to students and faculty telling them that ICE officers cannot enter school grounds without a warrant, *The New York Times* requested DHS comment on whether the ICE and CBP sensitive locations policies remain in effect and is the grounds for termination of DACA have changed.

-OPA promoted the Secretary's travel to Guatemala today on Twitter in addition to Acting Deputy Secretary Chip Fulghum's participation in the special naturalization anchor ceremony honoring President's Day.





**ICE**

**-*Fox News*** requested comment for a story about an illegal alien who killed a U.S. citizen in Denver after being released from custody by local authorities without giving ICE time to detain the individual. OPA provided the below:

**STATEMENT**

*Ever Andres Valles, 19, a citizen of Mexico, was encountered by ICE via the Criminal Alien Program following his arrest on local charges in October 2016. At the time of his arrest, ICE placed a detainer with the Denver County Jail. The detainer wasn't honored, and he was released by the jail Dec. 20, 2016, without notification to ICE. Valles is a known gang member whose gang history is documented in the Colorado gang database. Due to his criminal history and gang affiliation, Valles is an ICE immigration enforcement priority.*

**BACKGROUND**

(b)(5)

-A reporter with the *AZ Republic* requesting clarification regarding information given to her by the Maricopa County Attorney's Office pertaining to the Sheriff's newest posture on no longer ICE detainers. (b)(5)

(b)(5)

**STATEMENT**

*Last week, the Maricopa County Sheriff's Office (MCSO) announced his office would no longer honor immigration detainers. In conjunction with the sudden reversal of a long-*

*standing practice of honoring immigration detainers, the Sheriff also implemented a restriction prohibiting the arrest of individuals with detainers by ICE officers within the confines of the facility. Since the Friday announcement, a total of 32 inmates, who had an immigration detainer on file, have been released by MCSO back into the community, among them were individuals with criminal convictions for drug offenses, extreme DUIs, reckless driving and resisting an officer. As a result, the local Enforcement and Removal Operations (ERO) office realigned fugitive enforcement resources to prioritize, locate, and arrest those released as a result of the Sheriff's recently implemented directives. As of this statement, ERO has arrested five individuals who were released as a direct result of the Sheriff's change in policy.*

*ICE will continue to seek to collaborate with all law enforcement agencies throughout the State of Arizona, including the Maricopa County Sheriff's Office, to help ensure that individuals who may pose a threat to our communities are not released onto the street to potentially reoffend and harm individuals living within our communities."*

## BACKGROUND

(b)(5)

Gillian M. Christensen
Press Secretary (Acting)
Department of Homeland Security
(b)(6)



| | |
|---|---|
| **Sender:** | Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) > |
| **Recipient:** | "Christensen, Gillian </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >";<br>"Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >";<br>"Fulghum, Chip </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >";<br>"Higgins, Jennifer </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >";<br>"Hamilton, Gene </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) )/CN=RECIPIENTS/CN=(b)(6) >";<br>"(b)(6) </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP |



| | |
|---|---|
| | (b)(6)                )/CN=RECIPIENTS/CN= (b)(6)                >";<br>"Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP<br>(b)(6)                )/CN=RECIPIENTS/CN= (b)(6)              >";<br>"Hoffman, Jonathan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP<br>(b)(6)              )/CN=RECIPIENTS/CN= (b)(6)                >";<br>"Burke, Jenny </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP<br>(b)(6)              )/CN=RECIPIENTS/CN= (b)(6)          >" |
| **Sent Date:** | 2017/02/22 19:09:25 |
| **Delivered Date:** | 2017/02/22 19:09:27 |



| From: | Christensen, Gillian </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                       > |
|---|---|
| To: | "Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                   >"; "Fulghum, Chip </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                 >"; "Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                >"; "Higgins, Jennifer </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)               >"; "Hamilton, Gene </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)               >"; (b)(6)            </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  ))/CN=RECIPIENTS/CN=(b)(6)              >" |
| CC: | "Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                  >"; "Hoffman, Jonathan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                   >"; "Burke, Jenny </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6)                  )/CN=RECIPIENTS/CN=(b)(6)                  >" |
| Subject: | Press Round-Up: Friday, February 24, 2017 |
| Date: | 2017/02/24 18:50:32 |
| Priority: | Normal |
| Type: | Note |

**Friday, February 24, 2017**

**HQ**
-OPA issued a readout of Secretary Kelly's trip to Guatemala and Mexico.

-OPA has fielded numerous inquiries on the leaked draft I&A report from *AP, CNN, Fox News, CBS, ABC, NBC, Reuters, BBC, AFP, Bloomberg, The Guardian, Buzzfeed, Huffington Post, Washington Post* and others.  We have provided the following:

> ### STATEMENT
> *The seven countries were identified by the previous administration as being countries of concern for foreign terrorist travel to the Unites States.  Consequently, these countries were the focus of this administration's initial efforts to enhance vetting for foreign travel to the United States.  It is the policy of the United States to protect its citizens from foreign nationals who intend to commit terrorist attacks in the United States; and to prevent the admission of foreign nationals who intend to exploit United States immigration laws for malevolent purposes.*
>
> *The document referenced in this report and others was incomplete and had not been subject to the extensive interagency review process required of finished intelligence products.  Further, the report does not include data from other intelligence community sources.  It is clear on its face that it is an incomplete product.*
>
> *Allegations by opponents of the president's policies that senior DHS intelligence officials would politicize intelligence is unfortunate and untrue.  The dispute with this product was over sources and quality, not politics.*

-**Washington Post** reporter is working on a story about the Advocacy community warning potential DACA recipients not to apply for the program or renew their DACA as DHS might use that information to deport them from the country. OPA reiterated that Both EO implementation memos w/regard to immigration enforcement do not apply to DACA recipients, that the grounds for termination of DACA remain the same as when the program was created and that suggesting otherwise only creates needless fear and panic amongst the community of current DACA holders.

## ICE

- Reporters from several media outlets, including the **Arizona Republic, NPR and Fox,** have requested updated information regarding the Maricopa County Sheriff's recent announcement that MCSO will no longer honor ICE detainers or allow ICE officers physical access to its jails to take custody of inmates who're being released. The Sheriff is now alleging ICE is allowing people to walk out of their jails.

### STATEMENT

*U.S. Immigration and Customs Enforcement's (ICE) continues to seek to work collaboratively with law enforcement agencies statewide to take custody of criminal aliens being released by local authorities, but the Maricopa County Sherriff's Office's (MCSO) refusal to honor immigration detainers or allow ICE Enforcement and Removal Operations (ERO) officers to transfer custody within its jails has created an untenable and potentially perilous situation.*

*"ICE is committed to promoting public safety and we intend to use every resource at our disposal to find and arrest deportable criminals who're being released from Maricopa County jails," said Enrique Lucero, field office director for ERO Phoenix. "However, the most effective way to prevent these dangerous criminals from returning to our communities to potentially reoffend is for the Sheriff to honor our detainers, or at the very least allow us to take custody of these individuals within the secure confines of their facilities."*

*For years, MCSO honored immigration detainers. ICE vans responded to MCSO facilities twice daily, seven days a week to pick-up newly released inmates. This safe and seamless transfer of custody took place inside the jail. With the Sheriff's change in policy, Maricopa County became the only jurisdiction in Arizona that does not honor immigration detainers.*

*Now, MCSO only notifies ICE when an individual with an immigration detainer is being prepared for release. After the individual is processed, he or she is free to leave the MCSO facility and proceed outside onto a public sidewalk, where the Sheriff suggests ERO should attempt to make the arrest. We need to make it clear that even with advance notice and some biographical information about an inmate, ERO's ability to successfully identify and detain individuals under these circumstances is resource intensive, potentially dangerous, and, in some cases, unsuccessful.*

*In response, ERO has realigned its fugitive enforcement resources in order to locate and arrest potentially deportable criminal aliens released as a result of the Sheriff's new directives. Since the Sheriff's announcement Feb. 17, 52 people who had immigration detainers lodged against them have been released by the MCSO, through Feb. 23. So far, ERO has arrested six. The rest, who have likely abandoned their last known addresses, remain at large. Given the public safety implications, ERO's efforts to find and take custody of these individuals, and others released as a result of the new policies, will continue.*

*ICE is hopeful that a mutually agreed upon resolution is reached quickly.*

*ERO is charged with enforcing the Immigration and Nationality Act enacted by Congress, which includes arresting, detaining, and removing those who have violated immigration law.*

Gillian M. Christensen
Press Secretary (Acting)
Department of Homeland Security
(b)(6)



| Sender: | Christensen, Gillian </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) > |
|---|---|
| Recipient: | "Nielsen, Kirstjen </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Fulghum, Chip </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Metzler, Alan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Higgins, Jennifer </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Hamilton, Gene </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Balliet, Eric </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Lapan, David </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP ((b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Hoffman, Jonathan </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >"; "Burke, Jenny </O=DHS/OU=EXCHANGE ADMINISTRATIVE GROUP (b)(6) /CN=RECIPIENTS/CN=(b)(6) >" |
| Sent Date: | 2017/02/24 18:50:31 |
| Delivered Date: | 2017/02/24 18:50:32 |



*Press Office*
**U.S. Department of Homeland Security**

# External Affairs Guidance

Last UPDATED on **September 5, 2017 @ 9:20 am**

**Phased Termination of the DACA Program Announcement, Tuesday, September 5, 2017**

### MEDIA GUIDANCE

- Please refer media calls regarding DACA phased termination to the U.S. Department of Homeland Security's (DHS) Office of Public Affairs at (b)(6).

- Please refer media calls regarding DACA litigation to the Department of Justice's (DOJ) Office of Public Affairs at (b)(6) or (b)(6).

### ADDITIONAL POINTS OF CONTACT

DHS Public Affairs:
- DHS OPA Strategic Communication: Christyn Lansing, (b)(6) (b)(6)
- DHS OPA Press Office: Dave Lapan, (b)(6) Joanne Talbot, (b)(6)

DHS Office of Partnership and Engagement (OPE):
- John Barsa (b)(6)

DHS Office of Legislative Affairs:
- Jamie Phillips, (b)(6)
- David Wonnenberg, (b)(6)
- Uyen Dinh, (b)(6)

USCIS External Affairs:
- Gillian Christensen, (b)(6)
- (b)(6)

1



**EXTERNAL DOCUMENTS**

- o   Upcoming Key Roll-Out Dates
- o   Congressional Call Schedule (need WH inputs)
- o   Fact Sheet – public document
- o   Press Release – public document (DHS OPA)
- o   Talking Points (DHS OPA – included below)
- o   Media Call Advisory – public document (DHS OPA)
- o   Draft FAQs – public document  (DHS OPA)
- o   Draft Internal Q&A (DHS OPA)
- o   Secretary Statement – public document (DHS OPA – not included)
- o   Secretary Message to Employees – public document (DHS OPA – not included)

2



**KEY ROLL-OUT DATES AND ASSIGNMENTS**

| DATE | LEAD OFFICE (Name) | ACTION ITEM |
|---|---|---|
| **MONDAY 9.4.17** | | |
| 8:00 pm | **WH OLA** | Select Senior Congressional Leaders |
| **TUESDAY 9.5.17** | | |
| 7:30 am | **ALL** | Final Coordination Call with WH, DHS, USCIS OPA/OLA/OPE |
| 9:00 am | **DHS/OPA** | DHS Media Advisory for Call |
| 9:00 am | **DHS/WH OLA** | Legislative Staff Call Advisory |
| 9:30 am | **WH OPE/Comms; DHS OPE** | Surrogate Call 1 – Faith Based |
| 10:00 am | **WH OPE/Comms; DHS OPE** | Surrogate Call 2 – All Others |
| 10:00 am | **DOJ** | Notice to Plaintiffs Senior Officials |
| 10:00 am | **DHS/DOJ/WH** | Embargoed Press Call – SMEs – James McCament and Service Center, ICE (b)(6) (b)(6) |
| 11:00 am | **DOJ** | Attorney General Issues Statement |
| 11:00 am | **WH** | President Issues Statement |
| 11:00 am | **DHS/OPE** | Intergovernmental Advisory, Private Sector and Universities |
| 11:00 am | **DHS/OPA** | Materials posted online – AG Letter, Sec Memo, FAQs, Fact Sheet |
| 11:15 am | **DHS OPA** | Message from ASI to DHS Employees |
| 11:20 am | **USCIS AD1** | Message from USCIS Director to Leadership |

3



| 11:30 am | **USCIS AD1** | Message from USCIS Director to Employees |
|---|---|---|
| 11:30 am | **Acting Secretary Duke** | Calls to Congressional Leadership |
| 11:30 am | **DHS OLA/WH OLA** | Congressional Leadership Staff Conference Call – USCIS SMEs |
| 11:35 am | **USCIS Communications** | USCIS posts updated DACA landing page linking to both AG and AS1 memo as well as new, updated FAQs. USCIS tags existing DACA pages on website with a note directing them to the landing page for the most up-to-date information |
| 12:00 pm | **USCIS Service Center Operations (SCOPS)** | SCOPS instructs service centers to continue processing DACA initials and renewals under existing guidelines, with the exception that they should now adjudicate renewal requests even if the current validity period expires more than 150 days later. |
| 12:00 pm | **WH IGA/OPE** | Stakeholder Call 1 – State and Local elected leaders, law enforcement leadership and associations  – USCIS SME, ICE SME |
| 12:00 pm | **USCIS Office of Intake and Document Production (OIDP)** | USCIS OIDP instructs Lockbox to: 1. Immediately begin rejecting I-131 advance parole requests; 2. Begin rejecting I-821D/I-765 Initial filings physically received on or after 9/6/2017; Begin rejecting I-821D/I-765 Renewal filings physically received on or after 9/6/2017 where current validity expires on or after 3/6/2018. |
| 12:00 pm | **USCIS Service Center Operations (SCOPS)** | SCOPS instructs its service centers to administratively close any and all pending I-131 advance parole requests based on DACA. |
| 12:00 pm | **USCIS Field Operations (FOD)** | 3. FOD instructs Field Offices not to accept or approve any urgent DACA based I-131 advance parole requests. |
| 12:30 pm | **WH IGA/OPE** | Stakeholder Call 2 – Business  – USCIS SME, ICE SME |
| 1:00 pm | **WH** | WH Press Briefing – Sarah Sanders |

DHS-001-HQLI-00031-000029



| 1:00 pm | **WH IGA/OPE** | Stakeholder Call 3 – Universities – USCIS SME, ICE SME |
|---------|----------------|--------------------------------------------------------|
| 2:00 pm | **DHS PLCY** | International Partner Calls – USCIS SME, ICE SME |
| 3:30 pm | **DHS OPA/USCIS** | Tentative - DHS Implementation Specifics Call w Press – USCIS SME, ICE SME |

5



## CONGRESSIONAL CALL SCHEDULE

*Monday*
Mitch McConnell – Gen Kelly
Paul Ryan – Gen Kelly
Kevin McCarthy – Gen Kelly
John Cornyn – Gen Kelly

*Tuesday*
HSGAC:
        Chairman Johnson – Secretary Duke
        Ranking Member McCaskill – Secretary Duke
CHS:
        Ranking Member Thompson – Secretary Duke

        Steve Scalise – Gen Kelly

Democratic Leadership:
        Nancy Pelosi – Gen Kelly
        Steny Hoyer – Gen Kelly
        Chuck Schumer – Gen Kelly
        Dick Durbin – Gen Kelly

Senate:
        Chairman Chuck Grassley – AG Sessions
        Chairman Ron Johnson – AG Sessions
        Tom Cotton – AG Sessions
        David Perdue – AG Sessions
        Ted Cruz – AG Sessions
        Orrin Hatch – AG Sessions
        Ranking Member Diane Feinstein – AG Sessions
        Lindsay Graham – WHOLA (Marc Short/Amy Swonger)
        Jeff Flake – WHOLA (Marc Short/Amy Swonger)

House:
        Chairman Goodlatte -- AG Sessions
        Chairman McCaul -- General Kelly
        Ranking Member Conyers – AG Sessions

        Mario Diaz Balart – (WHOLA) Joyce Meyer
        Carlos Curbelo – (WHOLA) Ben Howard
        Ileana Ross Lehtinen – (WHOLA) Cindy Simms

DHS-001-HQLI-00031-000031



Will Hurd – (WHOLS) Cindy Simms
Martha McSally – (WHOLA) Cindy Simms
Steve Pearce – (WHOLA) Paul Teller
Mark Walker – (WHOLA) Paul Teller
Mark Meadows – (WHOLA) Paul Teller
Steve King – (WHOLA) Paul Teller
Bruce Babin – (WHOLA) Paul Teller
Lou Barletta – (WHOLA) Cindy Simms

7

DHS-001-HQLI-00031-000032



**TOP FIVE MESSAGES**

1. The Obama Administration instituted an unconstitutional program. The Attorney General sent a letter to the Department of Homeland Security on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

2. Given the Attorney General's findings on the legality of the DACA program, the President had two stark options. He could: 1) Do nothing and allow for the probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner or 2) phase out the program in an orderly fashion.

3. All current DACA beneficiaries are eligible to retain their benefits at least until March 5, 2018. Deferred action is always temporary in nature. The DACA program only gave recipients the ability to defer action on their immigration case for two-year increments with the potential for renewal. Should Congress decide to develop a permanent legislative solution for current beneficiaries while addressing the need for immigration enforcement, this action will allow them time to do so.

4. Individuals who have properly filed DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of the date of this memorandum, will have their applications adjudicated.

5. Properly filed DACA renewal applications and associated applications for Employment Authorization Documents from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017 will be adjudicated.

8



## FACT SHEET: Rescission of Deferred Action for Childhood Arrivals (DACA)

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," creating a non-congressionally authorized administrative program that permitted certain individuals who came to the United States as juveniles and meet several criteria—including lacking any current lawful immigration status—to request consideration of deferred action for a period of two years, subject to renewal, and eligibility for work authorization.  This program became known as Deferred Action for Childhood Arrivals (DACA).

The Obama administration chose to deploy DACA by Executive Branch memorandum—despite the fact that Congress affirmatively rejected such a program in the normal legislative process on multiple occasions. The constitutionality of this action has been widely questioned since its inception.

DACA's criteria were overly broad, and not intended to apply only to children. Under the categorical criteria established in the June 15, 2012 memorandum, individuals could apply for deferred action if they had come to the U.S. before their 16th birthday; were under age 31; had continuously resided in the United States since June 15, 2007; and were in school, graduated or had obtained a certificate of completion from high school, obtained a General Educational Development (GED) certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States. Significantly, individuals were ineligible if they had been convicted of a felony or a significant misdemeanor, but were considered eligible even if they had been convicted of up to two other misdemeanors.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA."

Based on this analysis, the President was faced with a stark choice: do nothing and allow for the probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner, or instead phase out the program in an orderly fashion. Today, Acting Secretary of Homeland Security Duke issued a memorandum (1) rescinding the June 2012 memo that established DACA, and (2) setting forward a plan for phasing out DACA. The result of this phased approach is that the Department of Homeland Security will provide a limited window in which it will adjudicate certain requests for DACA and associated applications for Employment Authorization Documents meeting parameters specified below.

9



Effective immediately, DHS:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, U.S. Customs and Border Protection will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, U.S. Citizenship and Immigration Services will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action for any reason, at any time, with or without notice.

It should be noted that DACA was not intended to be available to persons who entered illegally after 2007. Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

DHS-001-HQLI-00031-000035



**FINAL PRESS RELEASE**

## RESCISSION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS ("DACA")

WASHINGTON – Today, the Department of Homeland Security (DHS) initiated the orderly wind down of the program known as Deferred Action for Childhood Arrivals (DACA).

"This Administration's decision to terminate DACA was not taken lightly. The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws," said Acting Secretary Elaine Duke. "As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately. We chose the least disruptive option.

"With the measures the Department is putting in place today, no current beneficiaries will be impacted before March 5, 2018, nearly six months from now, so Congress can have time to deliver on appropriate legislative solutions. However, I want to be clear that no new initial requests or associated applications filed after today will be acted on."

On June 29, the attorneys general of Texas and several other states sent a letter to U.S. Attorney General Jeff Sessions asserting that the DACA program is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding an expansion of the DACA program and the now-rescinded program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). The letter noted that if DHS did not rescind the June 2012 DACA memo by September 5, 2017, the states would seek to amend the DAPA lawsuit to include a challenge to DACA.

Yesterday, Attorney General Sessions sent a letter to Acting Secretary Duke articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind down the program in an efficient and orderly fashion, and his office has reviewed the terms on which the Department will do so.

Based on guidance from Attorney General Sessions, and the likely result of potentially imminent litigation, Acting Secretary Elaine Duke today issued a memo formally rescinding the June 15,

11



2012 memorandum that created DACA, and initiating an orderly wind down of the program. This process will limit disruption to current DACA beneficiaries while providing time for Congress to seek a legislative solution. The details are contained in Acting Secretary Duke's September 5 memorandum, and in our Frequently Asked Questions. [insert hyperlinks to the documents]

### #

12



**Talking Points – DACA Rescission**

**BACKGROUND**

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," establishing an administrative  program that permitted certain individuals who came to the United States as juveniles and met several criteria—including lacking any lawful immigration status—to request consideration of deferred action for a period of two years, subject to renewal and eligibility for work authorization.

Recognizing the complexities associated with terminating the program, the Department will provide a limited window during which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below.

**TALKING POINTS: President Trump Directs Phased Ending of DACA**

- Acting Secretary Duke issued a memo rescinding the June 15, 2012 memorandum that created the Deferred Action for Childhood Arrivals (DACA) program.

- President Donald J. Trump, in close coordination with the Department of Homeland Security and the Department of Justice, considered a number of factors, including the legality of the DACA program, the likely outcome of imminent litigation, and the administrative complexities associated with ending the program.

- We are a nation of laws. DACA was an unconstitutional, unwarranted exercise of authority by the Executive Branch. Only the U.S. Congress has the authority to pass legislation to provide immigration benefits to individuals.

- President Obama noted repeatedly in the months and years leading up to the creation of DACA that the President of the United States does not have the authority to create such a an open-ended, wide-ranging program without Congressional authorization.

- DACA will be phased out. All DACA benefits are provided on a two-year basis, so individuals who currently have DACA will be *allowed to retain both DACA and their work authorizations (EADs) until they expire*.

- U.S. Citizenship and Immigration Services will adjudicate—on an individual, case-by-case basis—properly filed pending DACA *initial requests* and associated applications for Employment Authorization Documents that have been accepted as of September 5, 2017.

DHS-001-HQLI-00031-000038



- USCIS will adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of the date of this memorandum, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.

  Individuals who have not submitted a request by September 5th, for an *initial grant* under DACA may no longer do so. All requests for initial grants received after September 5th will be rejected.

- In general, individuals who will no longer have DACA will not proactively be referred to ICE and placed in removal proceedings unless they satisfy one of the Department's enforcement priorities.

- The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States—including proactively seeking travel documentation—or to apply for other immigration benefits for which they may be eligible.

- As of September 4, 2017, there are 689,821 individuals with current valid DACA.

- It should be noted that DACA was not intended to be available to persons who entered illegally after 2007.  Thus, persons entering the country illegally today, tomorrow or in the future will not be eligible for the wind down of DACA.

14



**Media Advisory – DACA**

### DHS TO HOST PRESS CALL ON DACA

WASHINGTON – Senior Department of Homeland Security (DHS) officials will participate in a press call today, Tuesday, Sept. 5 at 10 am EDT to discuss Deferred Action for Childhood Arrivals (DACA). The call will be held ON BACKGROUND and EMBARGOED.

Reporters who RSVP will receive an email with dialing instructions and additional information for this media-only briefing. Due to high interest, only one line will be allotted per news outlet.

**Tuesday, Sept. 5**

10:00 AM EDT      Senior officials from the Department of Homeland Security and the Department of Justice will host and participate in a press call to discuss Deferred Action for Childhood Arrivals (DACA).

OPEN PRESS*

*Credentialed media planning to call in must RSVP to (b)(6)      for conference call-in number and embargo information.*

15



**FAQ**                                                              **September 5, 2017**

**Frequently Asked Questions on the September 5, 2017 Recession of the Deferred Action for Childhood Arrivals (DACA) Program**

### Q1: Why is DHS phasing out the DACA program?

A1: Taking into consideration the federal court rulings in ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that program should be terminated. As such, the Acting Secretary of Homeland Security rescinded the June 15, 2012 memorandum establishing the DACA program. Please see the Attorney General's letter and the Acting Secretary of Homeland Security's memorandum for further information on how this decision was reached.

### Q2: What is going to happen to current DACA holders?

A2: Current DACA recipients will be permitted to retain both the period of deferred action and their employment authorization documents (EADs) until they expire, unless terminated or revoked. DACA benefits are generally valid for two years from the date of issuance.

### Q3: What happens to individuals who currently have an initial DACA request pending?

A3: Due to the anticipated costs and administrative burdens associated with rejecting all pending initial requests, USCIS will adjudicate—on an individual, case-by-case basis—all properly filed DACA initial requests and associated applications for EADs that have been accepted as of September 5, 2017.

### Q4: What happens to individuals who currently have a request for renewal of DACA pending?

A4: Due to the anticipated costs and administrative burdens associated with rejecting all pending renewal requests, USCIS adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted as of September 5, 2017, and from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.  USCIS will reject all requests to renew DACA and associated applications for EADs filed after October 5, 2017.

### Q5: Is there still time for current DACA recipients to file a request to renew their DACA?

A5: USCIS will only accept renewal requests and associated applications for EADs for the class of individuals described above in the time period described above.

16



**Q6: What happens when an individual's DACA benefits expire over the course of the next two years? Will individuals with expired DACA be considered illegally present in the country?**

A6: Current law does not grant any legal status for the class of individuals who are current recipients of DACA. Recipients of DACA are currently unlawfully present in the U.S. with their removal deferred.  When their period of deferred action expires or is terminated, their removal will no longer be deferred and they will no longer be eligible for lawful employment.

Only Congress has the authority to amend the existing immigration laws.

**Q7: Once an individual's DACA expires, will their case be referred to ICE for enforcement purposes?**

A7: Information provided to USCIS in DACA requests will not be proactively provided to ICE and CBP for the purpose of immigration enforcement proceedings, unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Q8: Will USCIS share the personal information of individuals whose pending requests are denied proactively with ICE for enforcement purposes?**

A8: Generally, information provided in DACA requests will not be proactively provided to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security of public safety, or meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Q10: Can deferred action received pursuant to DACA be terminated before it expires?**

A10: Yes. DACA is an exercise of deferred action which is a form of prosecutorial discretion. Hence, DHS will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

**Q11: Can DACA recipients whose valid EAD is lost, stolen or destroyed request a new EAD during the phase out?**

17

DHS-001-HQLI-00031-000042



A11: If an individual's still-valid EAD is lost, stolen, or destroyed, they may request a replacement EAD by filing a new Form I-765.

### Q12: Will DACA recipients still be able to travel outside of the United States while their DACA is valid?

A12: Effective September 5, 2017, USCIS will no longer approve any new Form I-131 applications for advance parole under standards associated with the DACA program. Those with a current advance parole validity period from a previously-approved advance parole application will generally retain the benefit until it expires. However, CBP will retain the authority it has always exercised in determining the admissibility of any person presenting at the border. Further, USCIS retains the authority to revoke or terminate an advance parole document at any time.

### Q13: What happens to individuals who have pending requests for advance parole to travel outside of the United States?

A13: USCIS will administratively close all pending Form I-131 applications for advance parole under standards associated with the DACA program, and will refund all associated fees.

### Q14: How many DACA requests are currently pending that will be impacted by this change? Do you have a breakdown of these numbers by state?

A14:  There were 106,341 requests pending as of August 20, 2017 – 34,487 initial requests and 71,854 renewals.  We do not currently have the state-specific breakouts.

### Q15: Is there a grace period for DACA recipients with EADs that will soon expire to make appropriate plans to leave the country?

A15: As noted above, once an individual's DACA and EAD expire—unless in the limited class of beneficiaries above who are found eligible to renew their benefits—the individual is no longer considered lawfully present in the United States and is not authorized to work.  Persons whose DACA permits will expire between September 5, 2017 and March 5, 2018 are eligible to renew their permits. No person should lose benefits under this memorandum prior to March 5, 2018 if they properly file a renewal request and associated application for employment authorization.

### Q16: Can you provide a breakdown of how many DACA EADs expire in 2017, 2018, and 2019?

A16:  From August through December 2017, 201,678 individuals are set to have their DACA/EADs expire. Of these individuals, 55,258 already have submitted requests for renewal of DACA to USCIS.

18



In calendar year 2018, 275,344 individuals are set to have their DACA/EADs expire. Of these 275,344 individuals, 7,271 have submitted requests for renewal to USCIS.

From January through August 2019, 321,920 individuals are set to have their DACA/EADs expire. Of these 321,920 individuals, eight have submitted requests for renewal of DACA to USCIS.

DHS-001-HQLI-00031-000044



**Q18: What were the previous guidelines for USCIS to grant DACA?**

A18: Individuals meeting the following categorical criteria could apply for DACA if they:

- Were under the age of 31 as of June 15, 2012;
- Came to the United States before reaching their 16th birthday;
- Have continuously resided in the United States since June 15, 2007, up to the present time;
- Were physically present in the United States on June 15, 2012, and at the time of making their request for consideration of deferred action with USCIS;
- Had no lawful status on June 15, 2012;
- Are currently in school, have graduated, or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and
- Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

20



**Internal Q&A for Surrogates and SMEs**

**Q1. Who made the decision on DACA, the President, Acting Secretary Duke or the Attorney General?**

A1. The Attorney General made the legal determination that the DACA program constitutes an unwarranted exercise of authority by the Executive Branch, is unconstitutional, and will likely face the same outcome as the DAPA program in imminent litigation. Based on that analysis, today (Sept. 5, 2017), the Acting Secretary of Homeland Security rescinded the June 15, 2012 memorandum establishing DACA and initiated a phase out of the program.

**Q2. What role did Gen. Kelly play in the decision?**

A2. Defer to the WH.

**Q3. The President said he had "great heart" for DACA kids. Why is he ending the program that protected them from deportation and allowed them to work?**

A3. Given the Attorney General's findings on the legality of the DACA program, the President was given two stark options. He could either allow the program to be challenged in court and risk have it struck down in a disruptive manner that terminated benefits for all DACA beneficiaries, or he could wind the program down in an orderly manner that ensured no current beneficiary was impacted for a minimum of six months while providing Congress and opportunity to seek an appropriate legislative solution as it sees fit. This decision reaffirms this Administration's long-stated and ongoing commitment to the rule of law.

**Q4. Many lawyers and advocacy groups believe DACA is legal. Why didn't the Administration let the courts decide?**

A4. A U.S. district court, affirmed by the 5th Circuit Court and U.S. Supreme Court, determined that the Deferred Action for Parents of Americans and Lawful Permanent Residents, (DAPA) program was unlawful. Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three— the November 20, 2014 memorandum on DAPA directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Because the DACA program was created in the same manner as that used to create the DAPA program, it is likely to be struck down by the court also. If the decision is left to the courts, there

21



is a probability that the entire DACA program could be immediately enjoined by a court in a disruptive manner.

**Q5. We're told the Administration was considering several options for DACA. Why was this option chosen?**

A5.   Given the Attorney General's findings on the legality of the DACA program, the President was given two stark options.  He could either allow the program to be challenged in court and risk having it struck down in a disruptive manner that terminated benefits for all DACA beneficiaries, or he could wind the program down in an orderly manner that ensured no current beneficiary was impacted for a minimum of six months while providing Congress an opportunity to seek an appropriate legislative solution as it sees fit. This decision reaffirms this Administration's long-stated and ongoing commitment to the rule of law.

**Q6. What happens to the 690,000 DACA recipients, who came to this country as children, through no fault of their own? Doesn't DHS have better things to do with its scarce resources than seek to deport these children?**

A6.  The Department has committed to an orderly wind down of the program, and no current beneficiaries will automatically lose their benefits as a result of these changes. Absent a law enforcement interest—which is generally the standard that has been in place since the inception of the program—the Department will generally not take actions to remove active DACA beneficiaries.

**Q7. Will ICE officers seek to arrest and deport DACA recipients or will they exercise prosecutorial discretion on these cases?**

A7.  See A6.

**Q8. Speaker Ryan, Sen. Hatch and other prominent Republicans voiced support for DACA and asked the President not to end the program to allow Congress time to act. Why did the Administration end the program rather than allowing Congress to legislate a solution?**

A8.  The Administration was faced with imminent litigation for a program that would likely fail in court, given the precedent set by litigation against the DAPA program. Instead of waiting for a court to strike down the program, the Administration chose to wind the program down in an orderly fashion.  In the interim, of course, Congress has the authority to pass any legislation it chooses.

**Q9. Did the Administration have discussions with the Texas Attorney General and the other AGs who threatened a lawsuit over DACA to see if they would delay the deadline given the situation? If not, why not?**

DHS-001-HQLI-00031-000047



A9.  The litigants in Texas indicated they would amend their complaint on September 5th if DHS did not rescind the DACA memo. The Department will not comment on specific communications between the litigants and the United States government.

**Q11. The President and Gen. Kelly voiced support for DACA over the past eight months. What changed their minds about ending the program?**

A11.  The Administration was faced with imminent litigation for a program that would likely fail in court, given the precedent set by litigation against the DAPA program. Instead of waiting for a court to strike down the program the Administration chose to wind the program down in an orderly fashion.  DACA was not a permanent solution to the issues it was created to address. A permanent solution can only be provided by legislation.

**Q12. Doesn't ending DACA, a program that was overwhelming supported by Democrats, as well as many Republicans, threaten the President's agenda in Congress this fall?**

A12.  No.  See A11.

**Q13. Many DACA recipients, because they came to the U.S. as children, don't know the countries to which they'll be deported to and don't speak the language there. How will they assimilate and survive, particularly in those countries with significant gang activity?**

A13.  DHS cannot ignore the immigration laws enacted by Congress even if it will create hardship for those who violate those laws. Only Congress has the authority to pass legislation to provide immigration benefits to individuals.

**Q14. What type of support will the U.S. provide to DACA recipients who are deported?**

A14. DHS does not provide affirmative benefits to individuals it deports.

**Q15. How many DACA recipients are able to seek legal status in the United States?**

A15.  That number is not known as a determination of status eligibility could only be made after an application by a current beneficiary.

**Q16. How many DACA recipients are or were working with authorization and what is the expected impact on American businesses of losing all those workers?**

A16. We do not have the number of DACA recipients who are currently employed.  Therefore any expected impact statement would be speculative.

**Q17. Can you give any assurances that once DACA status is revoked, ICE won't target those individuals for deportation?**

A17. DHS enforcement priorities will remain in place. Refer to A6.

23



**Q18. Given the devastation in Texas, and the large number of DACA recipients there, did the Administration consider making an exception for DACA recipients impacted by the hurricane and floods in southeast and south central Texas? If not, why not?**

A18. The Administration was faced with imminent litigation for a program that would likely fail in court, given the precedent set by litigation against the DAPA program. Instead of waiting for a court to strike down the program in a sudden and harmful manner, the Administration chose to wind the program down in the least disruptive manner possible. The wind down of the program is structured to allow for a minimum of six months continued benefits for all current DACA beneficiaries.

**Q19. How do you expect Mexico and Central American countries, facing many challenges that cause their citizens to migrate to the U.S., to accept an influx of former DACA recipients, many of whom no longer have immediate family in those countries? Is the U.S. prepared to offer assistance to those countries? What will this decision do to the already strained relationship with those governments?**

A19. The United States has robust international programs in place in many of these countries. The United States must respect the rule of law. To propose ignoring the rule of law because it will strain relationships with foreign partners is unwise. Additionally, as many advocates of the DACA program are quick to point out, many recipients of DACA are educated and will likely be highly valued employees in their home countries if they return.

**Q20. What impact will this decision have on funding for the President's border wall, given the opposition in Congress to funding a wall, as well as the questioning of the need for one, even among border state legislators?**

A20. The Administration's commitment to enforcing the rule of law should come as no surprise to Congress. The House has fully funded the fiscal year 2018 $1.6 billion requested for the wall system. This decision should have no impact on the request for adequate funding for a border wall on our southern border.

**Q21. Did the Administration reach out to Congressional leaders to seek a legislative solution before deciding to end DACA?**

A21. Congress did not pass legislation such as the "Dream Act" on numerous occasions for more than a decade, and Congress has had more than five years to find a legislative solution for DACA. If it wants to do so now, it has six months to do so before any current DACA beneficiaries are affected.

**Q22. What was Acting Secretary Duke's recommendation to the White House about the DACA program?**

24



A22.  We do not discuss internal Administration deliberations nor the Secretary's conversations with the President.

### Q23. Did USCIS make a recommendation to DHS or the White House on DACA? What was it?

A23.  We do not discuss internal Administration deliberations. USCIS was aware of the legal uncertainty of the DACA program and the potential for the program to be ended in litigation.

### Q24. Does USCIS have the personnel and the funding to handle this major change to the program? If not, will DHS seek additional funding?

A24.  Yes, USCIS has adequate personnel and funding to handle this change. USCIS employees are trained to adjudicate multiple types of benefits.  In FY 2016, USCIS received more than eight million applications and petitions adjudicated more than seven million. As the program winds down, any time previously spent processing DACA will transition to focus upon adjudicating other requests from individuals seeking benefits provided under the law.

### Q25. Did DHS or the Administration seek input from stakeholders before making this decision?  If so, who, and what were their recommendations? If not, why not?

A25.  We will not discuss private conversations that members of the Administration have had on this topic, but it is clear that many members of Congress and the advocacy community have conveyed their interests in the program – both for and against – on a frequent basis.

### Q26. If the Administration believes DACA is unconstitutional, why did it wait eight months before making this decision? What went into the deliberations?

A26.  The Administration will not comment on its litigation strategy with respect to DACA. However, DACA policy is vulnerable to the same legal and constitutional defects the court recognized with regard to DAPA.

### Q27. The Administration has said repeatedly that it's focused on national security and public safety threats. How do DACA kids threaten national security or public safety?

A27. This question does not address the reality of the situation the Administration faces. The Administration was faced with imminent litigation for a program that would likely fail in court, given the precedent set by litigation against the DAPA program. Instead of waiting for a court to strike down the program, the Administration chose to wind the program down in an orderly fashion. The notion that the Department will immediately dedicate personnel to seek out and remove former DACA beneficiaries is false.

Further, pursuant to dually enacted law, an individual who is in the United States illegally— whether from entering illegally or overstaying an authorized period of admission—is subject to

25



removal from the United States. A permanent solution can only be provided by legislation which only Congress can enact.

Finally, DHS enforcement priorities will remain in place whereby law abiding illegal immigrants remain a lower priority for DHS enforcement.

**Q28. Can you provide us a breakdown of DACA recipients, by state and/or age?  Which states will feel the biggest impact?**

A28.  No. We do not characterize recipients in that manner.

**Q29. Why is DHS ending parole for DACA recipients, who may need to travel to the countries where they will be deported or may voluntarily depart, to make arrangements in advance of their move?  Will those who choose to self-deport be allowed to travel back and forth to make appropriate arrangements? If not, why not, what's the risk?**

A29.  The parole program is intended for situations of urgent humanitarian need or of significant public benefit. Instead of a blanket allowance for DACA beneficiaries to travel abroad in contravention of the law's intended use, parole will only be granted as intended in the by Congress and outlined in the Immigration and Nationality Act.

**Q30. Since the program began, how many DACA recipients have become naturalized U.S. citizens or green card holders?**

A30. The number of DACA recipients who have applied for LPR status as of August 21, 2017 is 59,778 and 39,514 have been approved. In addition, 2,181 LPRs who originally had DACA approval applied for U.S. citizenship and 1,056 have taken the oath of citizenship

**Q31. With DACA ending, does this moot the Montes case? Will the government now ask for dismissal?**

A31.  We do not comment on ongoing litigation.

**Q32. The President has issued many Executive Orders since he has been in office. Why didn't he use an EO to continue the DACA program, in a different way than was done under Obama?**

A32.  The DACA program was created without legislation enacted by Congress via a Secretarial memorandum.  It can be ended in the same way.

**Q33. For DACA recipients who are enrolled in college or other educational institutions, will they be forced to drop out and lose the money they've paid to attend? What happens to those who worked to support themselves and pay for school now that they can no longer legally work?**

26



A33.  In general, DACA beneficiaries will not lose benefits under the rescission during the next six months, many not for two years.

**Q34. What criteria will be used to evaluate pending applications for initial DACA grants or renewals?**

A34.  USCIS will adjudicate—on an individual, case by case basis—all properly filed DACA initial requests and associated applications for Employment Authorization Documents that have been accepted as of September 5, 2017. It will also adjudicate—on an individual, case-by-case basis—all properly filed DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries whose benefits will expire between September 5, 2017 and March 5, 2018 that have been accepted as of October 5, 2017.

**Q35. Can DACA recipients with expiration dates in 2018 and beyond apply early for renewal, before the program shuts down?**

A35. Only recipients whose benefits expire between September 5, 2017 and March 5, 2018 can file renewal requests and associated applications for Employment Authorization Documents until October 5, 2017.  Any request to renew DACA filed after October 5, 2017 will be rejected by USCIS. Renewal requests from any other individual other than the limited class described above will be automatically rejected by USCIS.

**Q36. Is there a grace period for DACA recipients to apply for renewal? If not, why not?**

A36.  See Q35.

**Q37. Has the Texas AG indicated he'll no longer pursue a lawsuit based on this decision? Does this decision satisfy his concerns over the program?**

A37.  We believe the Administration's decision to phase the program out will render the threatened litigation unnecessary.

**Q38. Will DHS withhold action to deport DREAMERS while Congress is working on a legislative solution?  If so, for how long?**

A38.   In general, DACA recipients will not lose benefits under this rescission memorandum during the next six months, many not for two years.

**Q39. Who from DHS was involved in the discussions on ending DACA?**

A39.  We will not comment on internal deliberations or the specific individuals consulted.

**Q40. How much did the DACA program generate in fees each year? What will the loss of those fees mean for DHS's current funding and future budgets?**

27



A40.  The only fees associated with the DACA program covered the expenses from capturing a beneficiary's biometrics and adjudicating their application for an Employment Authorization Document on the form I-765. There was not a separate fee for the I-821D itself.  The I-765 fee has been sufficient to cover USCIS costs of administering the DACA program.

Q41.  **The President defended his travel executive order (EO) by citing broad authority over immigration rights, so why now is he deferring to Congress with DACA?**

A41. This is an apples-to-oranges comparison. First, the travel EO was a temporary ban on travel into the U.S. from terrorist prone countries in order to protect our national security interests as the appropriate federal agencies improved their vetting procedures. The president's authority to restrict people from entering the country represents the apex of presidential authority. See 8 USC 1182 (f). In the EO, the President exercised express power delegated to him by Congress.

Prior to Obama's 2012 announcement of DACA, he admitted he had no legal authority to ignore federal immigration law. But bowing to politics in an election year, he reversed course to authorize the program in what he even then called "a temporary stopgap measure." DACA was an unlawful order, based on the same statutes that the courts determined DAPA violated. Only Congress has the authority to amend the existing immigration laws.

DHS-001-HQLI-00031-000053

o A **Hurricane Watch** is issued when a tropical cyclone containing winds of at least 74 MPH poses a possible threat, generally within 48 hours.

o A **Hurricane Warning** is issued when sustained winds of 74 MPH or higher associated with a tropical cyclone are expected in 36 hours or less. A hurricane warning can remain in effect when dangerously high water or a combination of dangerously high water and exceptionally high waves continue, even though winds may be less than hurricane force.

For coastal flooding:
o A **Coastal Flood Watch** is issued when moderate to major coastal flooding is possible. A **Coastal Flood Warning** is issued when moderate to major coastal flooding is occurring or imminent.
o A **Coastal Flood Advisory** is issued when minor or nuisance coastal flooding is occurring or imminent.

### *Immigration Enforcement*

- U.S. Immigration and Customs Enforcement's (ICE) and U.S. Customs and Border Protection's (CBP) highest priorities are to promote life-saving and life-sustaining activities, the safe evacuation of people who are leaving the impacted area, the maintenance of public order, the prevention of the loss of property to the extent possible, and the speedy recovery of the region.

- The Department's law enforcement components will be at the ready to help anyone in need of assistance. In evacuation or response, we are committed to making sure that we can assist local authorities quickly, safely, and efficiently.

- Routine non-criminal immigration enforcement operations will not be conducted at evacuation sites, or assistance centers such as shelters or food banks. The laws will not be suspended, and we will be vigilant against any effort by criminals to exploit disruptions caused by the storm.

- ICE and CBP also seek to provide for the safety and security of those in our custody and to protect them from bodily harm in the event of a hurricane or a major destructive storm.

### DACA
- This Administration's decision to terminate DACA was not taken lightly.  The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws.  Given the Supreme Court's decision on DAPA, they do not believe DACA is legally viable, and thus the program should be ended.
- As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass

legislation; or allow the judiciary to potentially shut the program down completely and immediately.  The Administration choose the least disruptive option.

- I am very aware of the consequences of this action, and I sympathize with the DACA recipients whose futures may now be less certain.  But I am also frustrated on their behalf.  DACA was never more than deferred action—a bureaucratic delay—that never promised the rights of citizenship or legal status in this country.  The program did not grant recipients a future, it was instead only a temporary delay until a day of likely expiration. And for that reason, DACA was fundamentally a lie.

- If our current laws do not reflect our country's values, then I urge Congress to use its Constitutional authority to write and pass legislation that does.  I believe the President shares my confidence in the Congress.

## TEMPORARY PROTECTED STATUS

- Temporary Protected Status is a temporary immigration benefit that allows qualified individuals from designated countries (or parts of those countries) who are in the U.S. to stay here for a limited period of time.

- Currently, 10 countries are designated for TPS. The countries are South Sudan, Sudan, Somalia, Honduras, Nicaragua, El Salvador, Syria, Haiti, Nepal and Yemen. [Note: TPS for Liberia, Guinea and Sierra Leone expired May 21, 2017. Citizens of those countries were given six months to prepare for departure or apply for an immigration status for which they may be eligible.]

- TPS is a temporary benefit that does not lead to lawful permanent resident status or give any other immigration status.

- Individuals with TPS can obtain work authorization in the U.S. and may request travel authorization.

- Once granted TPS, an individual cannot be detained by DHS solely on the basis of his or her immigration status in the U.S. during the period TPS has been designated.



| From: | Dinh, Uyen (b)(6) |
| To: | "Joachim, Robert (b)(6) |
| CC: | "Blume, Allen (b)(6)<br>"Corbin, Susan (b)(6)<br>"Cassidy, Ben (b)(6)<br>"Wonnenberg, David (b)(6)<br>"Phillips, James M </ |
| Subject: | FW: RECISSION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS ("DACA") |
| Date: | 2017/09/07 14:29:32 |
| Priority: | Normal |
| Type: | Note |

Hi Bob--

This is what we sent to staffers post our 11:30 am DACA telecom this past Tuesday, Sept. 5. Please see below & feel free to distrubte.

(b)(7)(E)

Uyen



*U.S. Department of Homeland Security seal*
*Press Office*
**U.S. Department of Homeland Security**

# Press Release

September 5, 2017
Contact: DHS Press Office 202-282-8010

**RECISSION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS ("DACA")**

WASHINGTON – Today, the Department of Homeland Security (DHS) initiated the orderly wind down of the program known as Deferred Action for Childhood Arrivals (DACA).

"This Administration's decision to terminate DACA was not taken lightly. The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws," said Acting Secretary Elaine Duke. "As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately. We chose the least disruptive option."

On June 29, the attorneys general of Texas and several other states sent a letter to U.S. Attorney General Jeff Sessions asserting that the DACA program is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding an expansion of the DACA program and the now-rescinded program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). The letter noted that if DHS did not rescind the June 2012 DACA memo by September 5, 2017, the states would seek to amend the DAPA lawsuit to include a challenge to DACA.

Yesterday, Attorney General Sessions sent a letter to Acting Secretary Duke articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind down the program in an efficient and orderly fashion, and his office has reviewed the terms on which the Department will do so.

Based on guidance from Attorney General Sessions, Acting Secretary Elaine Duke today issued a memo formally rescinding the June 15, 2012 memorandum that created DACA, and initiating an orderly wind down of the program. This process will limit disruption to current DACA beneficiaries while providing time for Congress to seek a legislative solution. The details are contained in Acting Secretary Duke's September 5 memorandum, and in our Frequently Asked Questions.

# # #



FOR OFFICIAL USE ONLY

### PHONE CALL WITH SENATOR THOM TILLIS (R-NC)
### SENATE COMMITTEE ON THE JUDICIARY
### SEPTEMBER 5, 2017 @ 2:00PM EDT

**Contact Number:** Scheduler (b)(6)           will connect (b)(6)          .

**PURPOSE:**
- This call is an opportunity to articulate the Administration's cancellation of the Deferred Action for Childhood Arrivals (DACA) program.

**BACKGROUND:**
- Senator Tillis has expressed concerns about abruptly terminating DACA, particularly as regards the impact on the labor market.

- He is reportedly working on legislation that would enact DACA, in whole or in part, and bar the removal of Dreamers and certain qualifying aliens. This bill would offer an eventual path to U.S. citizenship for immigrants who entered illegally before Jan. 1, 2012, and were 16 years old or younger.

- Additionally, Tillis' proposal would grant high school graduates without a serious criminal record conditional immigration status for a five-year period. During that time, if they earn a higher-education degree, serve in the military or stay employed, they could apply for permanent residency and, eventually, citizenship.

**DISCUSSION POINTS:**
- On September 5, the Administration canceled the June 15, 2012 memorandum that created the program known as Deferred Action for Childhood Arrivals ("DACA").

- The President was given two stark options. He could allow the program to be challenged in court and risk having it struck down in a sudden, disruptive manner, or wind the program down in an orderly manner that ensured that no current beneficiary would be impacted for a minimum of six months while Congress looks for a proper legislative solution.

- President Trump and I appreciate what Dreamers bring to the diversity and economy of our nation but we are a nation of laws and DACA is not a legal program as it was not legislated by Congress. Only Congress has the authority to create and amend our nation's immigration laws.

- Again, no current DACA beneficiaries will be impacted by the Attorney General's decision before March 5, 2018. This should allow Congress sufficient time to develop a legislative solution to this issue – something I understand that you are attempting to address.

**Participants:**
Acting Secretary Elaine Duke
Ben Cassidy, Assistant Secretary, Office of Legislative Affairs

FOR OFFICIAL USE ONLY

Page 0005

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0006

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0007

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

FOR OFFICIAL USE ONLY

**PHONE CALL WITH SENATOR THOM TILLIS (R-NC)**
**SENATE COMMITTEE ON THE JUDICIARY**
**SEPTEMBER 5, 2017 @ 4:35PM EDT**

**Contact Number:** Scheduler (b)(6)        will connect – (b)(6)

**PURPOSE:**
- This call is an opportunity to articulate the Administration's cancellation of the Deferred Action for Childhood Arrivals (DACA) program.

**BACKGROUND:**
- Senator Tillis has expressed concerns about abruptly terminating DACA, particularly as regards the impact on the labor market, and wants to be a leader in solving this problem.
- He is working on legislation similar to that introduced by Congressman Curbelo (R-FL) called *Recognizing American Children (RAC) Act* which would bar the removal of Dreamers and certain qualifying aliens. This bill would offer an eventual path to U.S. citizenship for immigrants who entered illegally before Jan. 1, 2012, and were 16 years old or younger. The Senator believes his effort can be a strong conservative approach.
- Additionally, Tillis' proposal would grant high school graduates without a serious criminal record conditional immigration status for a five-year period. During that time, if they earn a higher-education degree, serve in the military or stay employed, they could apply for permanent residency and, eventually, citizenship.

**DISCUSSION POINTS:**
- On September 5, the Administration canceled the June 15, 2012 memorandum that created the program known as Deferred Action for Childhood Arrivals ("DACA").

- The President was given two stark options. He could allow the program to be challenged in court and risk having it struck down in a sudden, disruptive manner, or wind the program down in an orderly manner that ensured that no current beneficiary would be impacted for a minimum of six months while Congress looks for a proper legislative solution.

- President Trump and I appreciate what Dreamers bring to the diversity and economy of our nation but we are a nation of laws and DACA is not a legal program as it was not legislated by Congress. Only Congress has the authority to create and amend our immigration laws.

- While no new applications will be accepted effective immediately, no current DACA beneficiaries will be impacted by the Attorney General's decision before March 5, 2018. This should allow Congress sufficient time to develop a legislative solution to this issue – something I understand that you are attempting to address.

- Administration is working on its core principles for legislation it would like to see. DHS believes a strong enforcement element remains key.

**Participants:**
Acting Secretary Elaine Duke

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Ben Cassidy, Assistant Secretary, Office of Legislative Affairs



| From: | Corbin, Susan (b)(6) |
|---|---|
| To: | "Wonnenberg, David (b)(6) |
| | "Dinh, Uyen < (b)(6) |
| | "Phillips, James M </ (b)(6) |
| CC: | "Corbin, Susan </O= |
| | "Cassidy, Ben </O=[ |
| Subject: | FW: Americans Speak Out in Support of DACA, Urge the President to Protect DREAMers |
| Date: | 2017/09/05 14:18:06 |
| Priority: | Normal |
| Type: | Note |

For use w/ our background memos' and for visibility for S1 hearing preps.

**From:** Democratic Whip Press [mailto: (b)(6) ]
**Sent:** Tuesday, September 5, 2017 2:03 PM
**To:** Corbin, Susan < (b)(6) >
**Subject:** Americans Speak Out in Support of DACA, Urge the President to Protect DREAMers

Office of the Democratic Whip Steny H. Hoyer

September 5, 2017

## Americans Speak Out in Support of DACA, Urge the President to Protect DREAMers

*This morning, President Trump's Administration announced its intention to end the Deferred Action for Childhood Arrivals (DACA) program that has allowed 800,000 young people who have grown up here in the U.S. and only know this country as home to stay here and continue to contribute to the American economy. By making this decision, the Administration has ignored a wide range of support for this program, including Republicans, business leaders, faith-based organizations, education officials, and state and local leaders.*

*Republicans in Congress have urged the President to protect DREAMers—will they take*

*action?*

**House Speaker Paul Ryan (R-WI)**: "I don't think he should do [end DACA]. I believe that this [...] something Congress has to fix…" [Politico, 9/1/17]

**Reps. Daniel Donovan (R-NY), David Valadao (R-CA), Don Bacon (R-NE), Carlos Curbelo (R-FL), Jeff Denham (R-CA), Ilena Ros-Lehtinen (R-FL)**: "We write to express our support f[...] maintaining the protections of the Deferred Action for Childhood Arrivals (DACA) for current recipients of the policy…Children brought to the United States at a young age did not have a choi[...] in the matter, they did not willingly seek to violate American statues when they traveled with thei[...] families across the borders…Such cases require careful and thoughtful analysis about what is in th[...] best interests of our country." [Letter to President Trump, 8/22/17]

**Senator Orrin Hatch (R-UT)**: "I've urged the president not to rescind DACA, an action that wou[...] further complicate a system in serious need of a permanent, legislative solution…Like the presiden[...] I've long advocated for tougher enforcement of our existing immigration laws. But we also need a[...] workable, permanent solution for individuals who entered our country unlawfully as children through no fault of their own and who have built their lives here… That solution must come from Congress." [The Hill, 9/1/17]

**Senator Jeff Flake (R-AZ)**: "There are 800,000 DACA kids, kids who were brought across the border. The median age, I think, is 6 years old for those 800,000 when they came across the border. They should not be punished for the sins of their parents. That's just the basic principle th[...] we ought to follow here." [CNN, 9/3/17]

**Senator James Lankford (R-OK)**: "…We as Americans do not hold children legally accountable [...] the actions of their parents." [NBC News, 9/4/17]

*Business and technology leaders continue to voice their support for the program, which [...] allows talented DREAMers to work here in the U.S. and contribute to our economy:*

**Hundreds of business leaders representing a wide range of companies like AT&T, Cisco Systems, General Motors, Google, HP, United Airlines, and Visa**: "Dreamers are vital to the future of our companies and our economy. With them, we grow and create jobs. They are part of why we will continue to have a global competitive advantage. We call on President Trump to preserve the DACA program." [Letter to President Trump, 7/31/17]

**Tim Cook, CEO, Apple**: "250 of my Apple coworkers are #Dreamers. I stand with them. They deserve our respect as equals and a solution rooted in American values." [Twitter, 9/3/17]

**Mark Zuckerberg, CEO, Facebook**: "I stand with the Dreamers -- the young people brought to [...]

our country by their parents. Many have lived here as long as they can remember. Dreamers hav
special love for this country because they can't take living here for granted. They understand all t
opportunities they have and want nothing more than the chance to serve their country and their
community. And Dreamers deserve that chance." [Facebook Post, 8/31/17]

**Brad Smith, President, Microsoft**: "Although undocumented, these [DREAMers] grew up in the
United States, attended our schools, built careers and started businesses, bought houses, started
families and became part of our communities. …Today we know of 27 employees who are
beneficiaries of DACA. They are software engineers with top technical skills; finance professionals
driving our business ambitions forward; and retail and sales associates connecting customers to c
technologies. Each of them is actively participating in our collective mission to empower every
person and every organization on the planet to achieve more. They are not only our colleagues, b
our friends, our neighbors and valued members of the Microsoft community." [Blog Post, 8/31/17

*Leaders from faith-based organizations have spoken out about how ending the program*
*would cause serious harm to families and communities across the country:*

**A coalition of faith leaders, including the Franciscan Action Network, Disciples of Christ,**
**Church World Service, Sisters of Mercy, Leadership Conference of Women Religious**: "Fa
leaders from multiple Washington-based organizations stood together to show their support and
solidarity of young people who receive the protections of the Deferred Action for Childhood Arriva
(DACA) program. As the Trump administration considers stripping more than 800,000 young peop
of DACA protections by terminating the program, leaders of faith express their extreme
disappointment." [Release, 8/30/17]

**Patrick Carolan, Executive Director, Franciscan Action Network**: "Our Catholic faith and
Franciscan spirituality demand that we act on our faith. This is why we choose to fast to
demonstrate our support of these young people, many of whom were brought to this country at a
young age and had no choice. They should not have to be abandoned and separated from the onl
country they know. We strongly urge Congress to keep DACA as is and work diligently on a comm
sense path to citizenship, such as the DREAM Act." [Release, 8/30/17]

**Joan Marie Steadman, CSC, Executive Director, Leadership Conference of Women**
**Religious**: "The Leadership Conference of Women Religious is deeply troubled by continued threa
to the Deferred Action for Childhood Arrivals (DACA) by the Trump Administration and a coalition
state attorneys general. DACA has provided a common sense path to stability for our families and
communities, and a reaffirmation of the values upon which this nation was founded. Ending DACA
would cause irreparable harm to families and communities and force 800,000 of our young people
back into the shadows. As women of faith we take seriously the gospel call to welcome the strang
and care for those in need. Together with people of good will we will continue to work to ensure t

the dignity and rights of our immigrant brothers and sisters are respected." [Release, 8/30/17]

**Jean Stokan, Justice Coordinator for Immigration, Sisters of Mercy of the Americas**:
"DACA recipients have become some of the most talented and hard-working members of our Mer
educational institutions and the local communities in which we live and serve. We will not stand b
as these DACA recipients, as well as other undocumented immigrants and vulnerable groups, are
targeted and blamed for the economic and social problems facing this country." [Release, 8/30/1

**Rev. Dr. Sharon Stanley-Rea, Director, Disciples Refugee & Immigration Ministries,
Christian Church (Disciples of Christ) in the U.S. and Canada**: "DACA and TPS are not just
'protection programs' for recipients, but they benefit us ALL--as nearly ALL of our congregations a
institutions have leaders and pastors and neighbors who are recipients and are in our communitie
contribute to our economy, and enrich our lives.  Therefore, any effort of the President to rescind
the DACA and TPS programs seeks to bully the breath from their lives, and to browbeat our effor
to follow scripture's command for hospitality."  [Release, 8/30/17]

*Leaders in higher education have also spoken out in support of DREAMers in their
classrooms who have received study permits through the program:*

**640 college and university Presidents wrote a statement and letter asking President
Trump to uphold his promise to protect and support DREAMers**: "To our country's leaders
say that DACA should be upheld, continued, and expanded. We are prepared to meet with you to
present our case. This is both a moral imperative and a national necessity. America needs talent
and these students, who have been raised and educated in the United States, are already part of
our national community. They represent what is best about America, and as scholars and leaders
they are essential to the future." [Statement and Letter to President Trump, 11/21/16]

**Hispanic Association of Colleges and Universities**: "The nation as a whole greatly benefits fr
the education and/or employment of regularized DACA recipients. They should be able the make
their full contribution as tax-payers, professionals, skilled workers and leaders in the areas of
critical importance to the nation's economy and security. To address current workforce challenges
the U.S. needs to draw on the skills and energy of all immigrants, particularly those who have
demonstrated the commitment and determination to excel." [Letter to President Trump, 8/30/17]

**American Council on Education**: "…In order to lift this cloud of fear, we ask that you commit t
allowing these productive and high-achieving [DREAMers] to continue to work and study while yo
administration and Congress arrive at a permanent solution. The higher education community is
eager to work with you to find a

path forward…" [Letter to President Trump, 3/16/17]

**American Association of Colleges and Universities**: "AAC&U supports the continuation of protections for students under the Deferred Action for Childhood Arrivals (DACA) policy." [Statement, 8/29/17]

***State and local officials have spoken out in support of DACA, urging President Trump to support DREAMers:***

**A letter with hundreds of signatories, including local elected officials and law enforcement officials outlines the "enormous role" DREAMers play in local communities** "[We] are united in declaring that we are with Dreamers and DACA recipients. We recognize their enormous role in our communities and families and their contributions to our schools, workplaces and shared prosperity as a nation." [Letter to President Trump, WithDreamers.com]

**A letter from 20 Attorneys General**: "Mr. President, now is the time to affirm the commitment you made, both to the 'incredible kids' who benefit from DACA and to their families and our communities, to handle this issue 'with heart.' You said Dreamers should 'rest easy.' We urge you affirm America's values and tradition as a nation of immigrants and make clear that you will not only continue DACA, but that you will defend it…The cost of not doing so would be too high for America, the economy, and for these young people. For these reasons, we urge you to maintain a defend DACA, and we stand in support of the effort to defend DACA by all appropriate means." [Letter to President Trump, 7/21/17]

***Democrats in Congress will continue to stand with business leaders, faith leaders, leaders in education and local and state officials to protect DREAMers and push for a permanent legislative solution in the wake of President Trump's decision.***

***Click here to read the PDF.***

***Follow Whip Hoyer on Facebook, Twitter, and Instagram***

Visit www.democraticwhip.gov for more press, floor and member resources.
Change subscription settings



| (b)(6) | (b)(6) | (b)(6) | >" |
|---|---|---|---|
| **Sent Date:** | 2017/09/05 14:18:05 | | |
| **Delivered Date:** | 2017/09/05 14:18:06 | | |

Page 0016

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0017

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0018

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0019

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0020

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0021

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0022

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0023

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0024

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0025

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0026

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0027

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0028

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0029

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0030

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0031

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0032

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0033

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0034

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0035

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0036

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0037

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0038

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0039

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0040

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0041

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0042

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0043

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0044

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0045

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0046

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0047

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0048

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0049

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0050

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0051

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0052

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0053

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0054

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0055

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0056

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0057

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0058

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0059

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0060

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0061

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0062

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0063

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0064

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0065

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0066

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0067

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0068

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0069

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0070

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0071

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0072

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0073

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



| | |
|---|---|
| **From:** | Cassidy, Ben (b)(6) (6) (b)(6) |
| **To:** | "Wonnenberg, David (b)(6) "Dinh, Uyen (b)(6) (b)(6) "Phillips, James M (b)( (b)(6) |
| **CC:** | "Corbin, Susan (b)(6) (b)(6) |
| **Subject:** | FW: DACA Fact Sheet |
| **Date:** | 2017/09/04 16:59:39 |
| **Priority:** | Normal |
| **Type:** | Note |

Other than typos, any edits. Thx!

-----------------A/S for Legislative Affairs  Department of Homeland Security

**From:** Neumann, Elizabeth

**Sent:** Monday, September 04, 2017 4:43:45 PM

**To:** Hamilton, Gene; Hoffman, Jonathan; Lapan, David; Shah, Dimple; Maher, Joseph; Nealon, James; Petyo, Briana; McCament, James W; Cassidy, Ben; Barsa, John

**Cc:** Wolf, Chad

**Subject:** FW: DACA Fact Sheet



| | |
|---|---|
| **Sender:** | Cassidy, Ben (b)(6) (b)(6) |
| **Recipient:** | "Wonnenberg, David (b)(6) "Dinh, Uyen (b)(6) (b)(6) "Phillips, James M < (b)(6) "Corbin, Susan </O (b)(6) |
| **Sent Date:** | 2017/09/04 16:59:38 |
| **Delivered Date:** | 2017/09/04 16:59:39 |

Page 0076

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0077

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0078

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0079

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0080

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0081

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0082

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0083

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0084

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0085

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0086

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0087

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0088

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0089

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0090

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0091

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0092

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0093

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0094

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0095

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0096

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0097

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0098

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0099

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0100

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0101

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0102

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0103

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0104

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0105

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0106

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0107

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0108

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0109

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0110

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0111

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0112

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0113

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0114

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0115

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0116

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0117

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0118

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0119

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0120

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0121

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0122

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0123

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0124

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0125

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0126

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0127

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0128

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0129

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0130

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0131

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0132

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0133

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0134

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0135

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0136

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0137

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0138

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0139

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0140

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0141

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0142

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0143

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0144

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0145

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0146

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0147

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0148

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0149

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0150

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0151

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0152

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0153

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0154

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0155

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0156

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0157

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0158

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0159

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0160

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0161

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0162

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0163

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0164

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0165

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0166

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0167

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0168

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0169

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0170

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0171

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0172

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0173

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0174

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0175

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0176

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0177

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0178

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0179

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0180

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0181

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0182

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0183

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0184

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



| From: | Cassidy, Ben (b)(6) |
| | (b)(6)    (b)(6)    (b)(6) |
| To: | (b)(6)    (b)(6) |
| | (b)(6)    (b)(6) |
| Subject: | FW: DACA Fact Sheet |
| Date: | 2017/09/05 10:13:42 |
| Priority: | Normal |
| Type: | Note |

(b)(6) -- pls print. Thx. Ben

-----------------A/S for Legislative Affairs  Department of Homeland Security

**From:** Hoffman, Jonathan
**Sent:** Tuesday, September 05, 2017 9:51:28 AM
**To:** Cassidy, Ben
**Subject:** FW: DACA Fact Sheet



**From:** FLANAGAN, PATRICK S
**Sent:** Monday, September 4, 2017 9:28 PM
**To:** Blank, Thomas <(b)(6)          >; Hamilton, Gene
<(b)(6)                >; McCament, James W <(b)(6)
Shah, Dimple <(b)(6)              >; Homan, Thomas <(b)(6)
Neumann, Elizabeth <(b)(6)          >;  Hoffman, Jonathan
(b)(6)                    >; Lapan, David <(b)(6)          Maher, Joseph
                          Nealon, James <                >; Petyo, Briana
(b)(6)                >; Cassidy, Ben <(b)(6)        Barsa,  John
                    MCALEENAN, KEVIN K <(b)(6)              >; Short,
Tracy <(b)(6)
**Cc:** Wolf, Chad (b)(6)
**Subject:** RE: DACA Fact Sheet

Gene

CBP edits attached.

(b)(5)

V/R
Patrick

---

**From:** Blank, Thomas
**Sent:** Tuesday, September 05, 2017 2:02:31 AM
**To:** Hamilton, Gene; McCament, James W; Shah, Dimple; Homan, Thomas; Neumann, Elizabeth; Hoffman, Jonathan; Lapan, David; Maher, Joseph; Nealon, James; Petyo, Briana; Cassidy, Ben; Barsa, John; MCALEENAN, KEVIN K; Short, Tracy; FLANAGAN, PATRICK S
**Cc:** Wolf, Chad
**Subject:** RE: DACA Fact Sheet

Gene:

Here are ICE's comments.

Tom

---

**From:** Hamilton, Gene
**Sent:** Monday, September 4, 2017 7:35 PM
**To:** McCament, James W; Shah, Dimple; Homan, Thomas; Neumann, Elizabeth; Hoffman, Jonathan; Lapan, David; Maher, Joseph; Nealon, James; Petyo, Briana; Cassidy, Ben; Barsa, John; MCALEENAN, KEVIN K; Short, Tracy; Blank, Thomas; FLANAGAN, PATRICK S
**Cc:** Wolf, Chad
**Subject:** RE: DACA Fact Sheet

Anyone else?

Gene P. Hamilton
Senior Counselor to the Secretary
U.S. Department of Homeland Security

---

**From:** McCament, James W
**Sent:** Monday, September 4, 2017 7:35 PM
**To:** Shah, Dimple <(b)(6)                          >; Homan, Thomas
<(b)(6)                          >; Hamilton, Gene <(b)(6)                          > Neumann,
Elizabeth <(b)(6)                  Hoffman, Jonathan
(b)(6)                          >; Lapan, David <(b)(6)                          Maher, Joseph
                          Nealon, James <                          >; Petyo, Briana
(b)(6)                  >; Cassidy, Ben (b)(6)                  ; Barsa, John
                  MCALEENAN, KEVIN K (b)(6)                          ;
Short, Tracy <(b)(6)                  ; Blank, Thomas <(b)(6)          ;
FLANAGAN, PATRICK S <(b)(6)          
**Cc:** Wolf, Chad <(b)(6)                  ;
**Subject:** RE: DACA Fact Sheet

All, attached with USCIS edits.

**James W. McCament**
Director (Acting) | Deputy Director
U.S. Citizenship and Immigration Services
Department of Homeland Security
(b)(6)          (Deputy Director's Office)



DHS ICON

*This email (including any attachments) is intended solely for the use of the addressee(s) and may contain information that is sensitive or otherwise protected by applicable law. If you are not the intended recipient, please notify USCIS immediately by replying to this message and destroy all copies of this message and any attachments. Thank you.*

**From:** Shah, Dimple
**Sent:** Monday, September 04, 2017 5:33 PM
**To:** Homan, Thomas; McCament, James W; Hamilton, Gene; Neumann, Elizabeth; Hoffman, Jonathan; Lapan, David; Maher, Joseph; Nealon, James; Petyo, Briana; Cassidy, Ben; Barsa, John; MCALEENAN, KEVIN K; Short, Tracy; Blank, Thomas; FLANAGAN, PATRICK S
**Cc:** Wolf, Chad
**Subject:** RE: DACA Fact Sheet

Edits attached.

**From:** Homan, Thomas
**Sent:** Monday, September 4, 2017 5:14 PM
**To:** McCament, James W <(b)(6)                    >; Hamilton, Gene
<(b)(6)                   >; Neumann, Elizabeth <(b)(6)                        >;
Hoffman, Jonathan (b)(6)                        >; Lapan, David
<(b)(6)                >; Shah, Dimple <(b)(6)                      >; Maher, Joseph
(b)(6)                 >; Nealon, James <(b)(6)                     >; Petyo, Briana
(b)(6)                 >; Cassidy, Ben <(b)(6)                    >; Barsa, John
<(b)(6)             MCALEENAN, KEVIN K <(b)(6)                          >;
Short, Tracy (b)(6)                      >; Blank, Thomas <(b)(6)                   >;
FLANAGAN, PATRICK S <(b)(6)                >
**Cc:** Wolf, Chad <(b)(6)                      >
**Subject:** RE: DACA Fact Sheet

Thanks

Sent with BlackBerry Work
([www.blackberry.com](www.blackberry.com))

**From:** McCament, James W <(b)(6)                          >
**Date:** Monday, Sep 04, 2017, 5:01 PM



**To:** Hamilton, Gene (b)(6)                              >, Neumann, Elizabeth
<(b)(6)                          > Hoffman, Jonathan <(b)(6)                        >, Lapan,
David <(b)(6)                >, Shah, Dimple (b)(6)                          >, Maher, Joseph
<(b)(6)            >, Nealon, James <                                        >, Petyo, Briana
(b)(6)                          >, Cassidy, Ben <(b)(6)                  >, Barsa, John
                        Homan, Thomas <(b)(6)                            >, MCALEENAN,
KEVIN K <(b)(6)                                          >, Short, Tracy <(b)(6)
Blank, Thomas <(b)(6)              >(b)(6)                >, FLANAGAN, PATRICK S
<(b)(6)
**Cc:** Wolf, Chad <(b)(6)                                >
**Subject:** RE: DACA Fact Sheet

Thanks Gene.  Reattaching the Fact Sheet for ICE and CBP.

**James W. McCament**
Director (Acting) | Deputy Director
U.S. Citizenship and Immigration Services
Department of Homeland Security
(b)(6)                  (Deputy Director's Office)



DHS ICON

*This email (including any attachments) is intended solely for the use of the addressee(s) and may contain*
*information that is sensitive or otherwise protected by applicable law. If you are not the intended recipient, please*
*notify USCIS immediately by replying to this message and destroy all copies of this message and any attachments.*
*Thank you.*

**From:** Hamilton, Gene
**Sent:** Monday, September 04, 2017 5:00 PM
**To:** Neumann, Elizabeth; Hoffman, Jonathan; Lapan, David; Shah, Dimple; Maher, Joseph;
Nealon, James; Petyo, Briana; McCament, James W; Cassidy, Ben; Barsa, John; Homan,
Thomas; MCALEENAN, KEVIN K; Short, Tracy; Blank, Thomas; FLANAGAN, PATRICK S
**Cc:** Wolf, Chad
**Subject:** RE: DACA Fact Sheet

Adding ICE and CBP. Can y'all please provide input in the timeframe requested? I
already noticed some things in this draft that need edits for their equities.

Thank you!

Gene P. Hamilton
Senior Counselor to the Secretary
U.S. Department of Homeland Security

**From:** Neumann, Elizabeth
**Sent:** Monday, September 04, 2017 4:43:45 PM
**To:** Hamilton, Gene; Hoffman, Jonathan; Lapan, David; Shah, Dimple; Maher, Joseph; Nealon, James; Petyo, Briana; McCament, James W; Cassidy, Ben; Barsa, John
**Cc:** Wolf, Chad
**Subject:** FW: DACA Fact Sheet

For review and edits. Please send edits to Gene. Gene please collect comments and send back to Chad and me by 8:30 pm.

---

**From:** Matich, Nicholas T. EOP/WHO
**Sent:** Monday, September 04, 2017 4:33:43 PM
**To:** Wolf, Chad; Neumann, Elizabeth; (b)(6)
**Cc:** Staff Secretary
**Subject:** DACA Fact Sheet

Good afternoon,

Please find attached a draft fact sheet regarding the termination of DACA, which will be released tomorrow by the White House. Please reply with comments and edits from your agencies by 9:00PM tonight.

Many thanks,
The White House Staff Secretary



| Sender: | Cassidy, Ben (b)(6) | | |
| --- | --- | --- | --- |
| | (b)(6) | (b)(6) | (b)(6) |
| Recipient: | (b)(6) | (b)(6) | |
| | (b)(6) | (b)(6) | (b)(6) |
| Sent Date: | 2017/09/05 10:13:42 | | |



| From | (b)(6) | |
|---|---|---|
| To | | |
| **Subject:** | RECISSION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS ("DACA") | |
| **Date:** | 2017/09/05 12:27:16 | |
| **Priority:** | Normal | |
| **Type:** | Note | |

Good afternoon – below please find a Department of Homeland Security press release regarding the Deferred Action for Childhood Arrivals (DACA) program.  Please note the links to the Department's website with additional information.

Thank you.

(b)(6)

Associate Director
Office of Legislative Affairs
U. S. Department of Homeland Security
Washington, DC 20528





*U.S. Department of Homeland Security seal*
*Press Office*
**U.S. Department of Homeland Security**

# Press Release

September 5, 2017
Contact: DHS Press Office 202-282-8010

## RECISSION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS ("DACA")

WASHINGTON – Today, the Department of Homeland Security (DHS) initiated the orderly wind down of the program known as Deferred Action for Childhood Arrivals (DACA).

"This Administration's decision to terminate DACA was not taken lightly. The Department of Justice has carefully evaluated the program's Constitutionality and determined it conflicts with our existing immigration laws," said Acting Secretary Elaine Duke. "As a result of recent litigation, we were faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately. We chose the least disruptive option."

On June 29, the attorneys general of Texas and several other states sent a letter to U.S. Attorney General Jeff Sessions asserting that the DACA program is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding an expansion of the DACA program and the now-rescinded program known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). The letter noted that if DHS did not rescind the June 2012 DACA memo by September 5, 2017, the states would seek to amend the DAPA lawsuit to include a challenge to DACA.

Yesterday, Attorney General Sessions sent a letter to Acting Secretary Duke articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind down the program in an efficient and orderly fashion, and his office has reviewed the terms on which the Department will do so.

Based on guidance from Attorney General Sessions, Acting Secretary Elaine Duke today issued a memo formally rescinding the June 15, 2012 memorandum that created DACA, and initiating an orderly wind down of the program. This process will limit disruption to current DACA beneficiaries while providing time for Congress to seek a legislative solution. The details are contained in Acting Secretary Duke's September 5 memorandum, and in our Frequently Asked Questions.

# # #

| Sender | (b)(6) | |
|--------|--------|--|

| Recipient: | (b)(6) (b)(6) |
|---|---|
| Sent Date: | 2017/09/05 12:27:15 |
| Delivered Date: | 2017/09/05 12:27:16 |

Page 0193

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0194

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0195

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0196

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0197

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0198

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0199

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0200

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0201

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0202

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0203

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0204

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0205

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0206

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0207

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0208

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0209

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0210

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0211

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0212

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0213

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0214

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0215

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0216

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0217

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0218

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0219

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0220

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0221

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0222

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0223

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0224

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0225

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0226

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0227

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0228

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0229

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0230

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0231

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0232

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0233

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0234

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0235

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0236

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0237

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0238

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0239

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0240

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0241

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0242

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0243

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0244

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0245

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0246

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0247

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0248

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0249

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0250

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0251

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0252

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0253

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0254

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0255

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0256

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0257

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0258

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0259

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0260

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0261

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0262

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



There's no statement from Hatch that I can find.  Calling his office now…

James M. Phillips
Director | Office of Legislative Affairs
U.S. Department of Homeland Security
(b)(6)

**From:** Corbin, Susan
**Sent:** Friday, September 1, 2017 11:55 AM
**To:** Phillips, James M <(b)(6)>; Wonnenberg, David
(b)(6)>
**Cc:** Cassidy, Ben <(b)(6)>
**Subject:** RE: Hatch/DACA?

It may be that someone misheard

**From:** Phillips, James M
**Sent:** Friday, September 01, 2017 11:51:44 AM
**To:** Corbin, Susan; Wonnenberg, David
**Cc:** Cassidy, Ben
**Subject:** RE: Hatch/DACA?

I haven't seen the statement but will call his staff now to get more info.

James M. Phillips
Director | Office of Legislative Affairs
U.S. Department of Homeland Security
(b)(6)

**From:** Corbin, Susan
**Sent:** Friday, September 1, 2017 11:50 AM
**To:** Phillips, James M <(b)(6)>; Wonnenberg, David
<(b)(6)>

**Cc:** Cassidy, Ben (b)(6)                    Corbin, Susan (b)(6)
**Subject:** FW: Hatch/DACA?

Please call Hatch staff ASAP to get to the accurate info and USCIS –

---

**From:** Lapan, David
**Sent:** Friday, September 01, 2017 11:47:45 AM
**To:** Cassidy, Ben; Corbin, Susan; Harper, Jerald
**Subject:** FW: Hatch/DACA?

Any awareness or insight?

---

**From:** Dean DeChiaro
**Sent:** Friday, September 01, 2017 11:46:02 AM
**To:** Lapan, David
**Subject:** Hatch/DACA?

Hi Dave --

Orrin Hatch's office just put out a statement that implies the President has ended DACA but I
don't see anything else so I think it may have been sent out by accident. Can you clarify?
Thanks.

Dean

Dean DeChiaro
Immigration reporter
CQ Roll Call
(b)(6)
(b)(6)

This e-mail may contain confidential material. If you are not an intended recipient, please notify the sender and delete all copies. It
may also contain personal views which are not the views of CQ Roll Call or its owner, The Economist Group. We may monitor e-
mail to and from our network. For company information go to http://legal.economistgroup.com.



| Sender: | Phillips, James M (b)(6) |
| :--- | :--- |
| | (b)(6) |
| Recipient: | "Corbin, Susan (b)(6) |
| | (b)(6) |
| | "Wonnenberg, David (b)(6) |
| | (b)(6) |
| | "Cassidy, Ben (b)(6) |
| | (b)(6) |
| Sent Date: | 2017/09/01 11:56:19 |



| From: | Cassidy, Ben < (b)(6) (b)(6) (b)(6) (b)(6) > |
| To: | "Phillips, James M (b)(6) (b)(6) (b)(6) >" |
| CC: | "Corbin, Susan (b)(6) (b)(6) (b)(6) >" |
| Subject: | FW: Hatch/DACA? |
| Date: | 2017/09/01 11:49:41 |
| Priority: | Normal |
| Type: | Note |

Have we seen statement from Sen Hatch re DACA? Thx.

-----------------A/S for Legislative Affairs  Department of Homeland Security

**From:** Lapan, David

**Sent:** Friday, September 01, 2017 11:47:45 AM

**To:** Cassidy, Ben; Corbin, Susan; Harper, Jerald

**Subject:** FW: Hatch/DACA?

Any awareness or insight?

**From:** Dean DeChiaro

**Sent:** Friday, September 01, 2017 11:46:02 AM

**To:** Lapan, David

**Subject:** Hatch/DACA?

Hi Dave --

Orrin Hatch's office just put out a statement that implies the President has ended DACA but I don't see anything else so I think it may have been sent out by accident. Can you clarify? Thanks.

Dean

Dean DeChiaro
Immigration reporter

CQ Roll Call

(b)(6)

This e-mail may contain confidential material. If you are not an intended recipient, please notify the sender and delete all copies. It may also contain personal views which are not the views of CQ Roll Call or its owner, The Economist Group. We may monitor e-mail to and from our network. For company information go to http://legal.economistgroup.com.

| Sender: | Cassidy, Ben <(b)(6) <br> (b)(6) |
|---|---|
| Recipient: | "Phillips, James M <(b)(6) <br> (b)(6) <br> "Corbin, Susan <(b)(6) <br> (b)(6) |
| Sent Date: | 2017/09/01 11:49:41 |



| From: | Wonnenberg, David (b)(6) |
| | ((b)(6)                    (b)(6)                    (b)(6) |
| To: | "Cassidy, Ben (b)(6) |
| | (b)(6)          (b)(6)          (b)(6)          '; |
| | "Dinh, Uyen (b)(6) |
| | ((b)(6)          (b)(6)          (b)(6)          ' |
| **Subject:** | RE: Press Round-up: August 1, 2017 |
| **Date:** | 2017/08/01 18:38:54 |
| **Priority:** | Normal |
| **Type:** | Note |

Thanks. Got it from Joanne.

V/r,
David

(b)(6)

**From:** Cassidy, Ben
**Sent:** Tuesday, August 1, 2017 6:38 PM
**To:** Wonnenberg, David <(b)(6)                    Dinh, Uyen <(b)(6)                    >
**Subject:** FW: Press Round-up: August 1, 2017

-----------------A/S for Legislative Affairs  Department of Homeland Security

**From:** Talbot, Joanne
**Sent:** Tuesday, August 01, 2017 6:33:28 PM
**To:** Barsa, John; Cassidy, Ben; Cissna, Tiffany; Claffey, Lauren; Clark, Alaina; Corbin, Susan; Dinh, Uyen; Frazier, Trent; Fulghum, Chip; Hamilton, Gene; Hoffman, Jonathan; Krebs, Christopher; Lansing, Christyn; Lapan, David; Maher, Joseph; Media Inquiry; Neumann, Elizabeth; Nielsen, Kirstjen; (b)(6) (b)(6)          Shah, Dimple; Stoddard, Kaitlin; Taylor, Miles; Wolf, Chad; Wonnenberg, David
**Subject:** Press Round-up: August 1, 2017

**Tuesday, August 1, 2017:**

**HQ**
 -OPA issued three news releases today:

DHS ISSUES WAIVER TO EXPEDITE BORDER CONSTRUCTION PROJECTS IN SAN
DIEGO AREA

DHS ACTING SECRETARY DUKE JOINS TECH COMPANIES, UK HOME SECRETARY
RUDD TO DISCUSS COMBATING ONLINE TERRORIST RECRUITMENT

PURSUANT TO EXECUTIVE ORDER ON PUBLIC SAFETY, DEPARTMENTS OF
JUSTICE AND HOMELAND SECURITY RELEASE DATA ON INCARCERATED ALIENS

-Tomorrow, Deputy Assistant Secretary Dave Lapan will host a media gaggle at the Ronald
Reagan Building.

**ICE**
- ICE issued a news release today announcing the results of Operation Border Guardian/Border
Resolve

**USCIS**
-USCIS responded to media queries today about a DACA recipient in Seattle accused of rape.
USCIS provided the following statement:

*"Salvador Garcia Diaz was granted DACA in June 2013 and was an active DACA recipient at
the time the crime was committed. His DACA has been terminated today, per standard
procedure, based on his criminal arrest."*

**Notable Clips:**
**Homeland Security to Bypass Environmental Laws in Border Wall Work (*NYT*, 8/1/17)**
The Department of Homeland Security on Tuesday said that it would use its authority to exempt
the agency from having to comply with environmental and other laws in its efforts to build
border walls and access roads in the San Diego area. The waiver would apply to the construction
of several wall prototypes the agency plans to build in the region in response to an executive
order signed by President Trump in January. Congress has passed several laws that give
Homeland Security the authority to exempt its construction of physical barriers like border walls
from a variety of environmental and land management laws. Homeland Security invoked that
authority five times from 2005 to 2008, the agency said. Most of the construction of the border
walls currently in use was done during that period. David Lapan, a spokesman for the
department, said the waiver would also apply to replacement fencing and roads the agency plans
to build in the San Diego area. The waiver will be published in the Federal Register in the
coming days, the agency said. LINK

**Paul Ryan: 'It is time for the wall' (*The Hill*, 8/1/17)**
House Speaker Paul Ryan (R-Wis.) called for action on President Trump's proposed wall along
the U.S.-Mexico border in a video he tweeted out on Tuesday. "RT if you agree," he posted on
Twitter, along with a video of a border visit he made. "It is time for the wall." The video shows
Speaker Ryan on a visit to the Rio Grande Valley in Texas, where he met with Border Patrol

officers. "When you see what they're up against, it really gives you even greater respect for what they do. They clearly need more tools and more support to do their jobs effectively," he said. In March, during the push to fund the federal government through the rest of the fiscal year, Ryan said Congress would deny the administration's request for additional funding for the wall from the Department of Homeland Security. LINK

### ICE is partnering with 18 more sheriff's departments to ramp up its deportation machine (*Business Insider*, 8/1/17)

In an escalation of local law enforcement agencies' participation in immigration enforcement, the Immigration and Customs Enforcement (ICE) agency on Monday announced it had struck 18 new partnerships with sheriff's departments in Texas. The announcement is a notable development in the Trump administration's efforts to ramp up its deportation apparatus, following memos from the Department of Homeland Security in February announcing that it would expand a controversial ICE program that had largely fallen into disuse under the Obama administration. ICE's 287(g) program establishes agreements with local law enforcement agencies, allowing them to deputize officers as immigration agents and enforce federal immigration law. In recent years, the federal government had allowed most of the previously existing agreements to lapse without renewal, leaving roughly 38 participating law enforcement agencies by the time President Donald Trump took office. LINK

### Commandant: 'I Will Not Break Faith' With Transgender Coast Guardsmen (*Military.com*, 8/1/17)

As military services await guidance following President Donald Trump's announcement last week via Twitter of a ban on transgender service members, the commandant of the Coast Guard is speaking out, saying he has no intention of leaving transgender Coast Guardsmen out in the cold. Speaking on the topic for the first time at the Center for Strategic and International Studies on Tuesday morning, Adm. Paul Zukunft said his first action upon becoming aware of Trump's tweets was to have his office reach out to all 13 members of the Coast Guard who have self-identified as transgender. LINK

### New data on H-1B visas prove that IT outsourcers hire a lot but pay very little (*Quartz*, 8/1/17)

Hard numbers have been released by the US government agency that screens visas for high-skilled foreign workers, and they are not pretty. Data made available by the US Citizenship and Immigration Services (USCIS) for the first time show that the widely made complaint about the visa program is true: a small number of IT outsourcing companies get a disproportionately high number of H-1B visas and pay below-average wages to their workers. LINK



| Sender: | Wonnenberg, David (b)(6) |
| | (b)(6) |
| Recipient: | "Cassidy, Ben (b)(6) |
| | (b)(6) |
| | "Dinh, Uyen (b)(6) |
| | (b)(6) |
| Sent Date: | 2017/08/01 18:38:54 |

**Hispanic Caucus warns that the Trump government will not give up its aggressive deportation policy**

Some of those behind a closed-door meeting with DHS Secretary John Kelly say that undocumented immigrants must "prepare for the worst," and that DACA's uncertain future is in the hands of Attorney General Jeff Sessions.

Concern rose among members of Congressional Hispanic caucus Wednesday after meeting with DHS Secretary John Kelly to discuss the increase in deportation operations, the future of undocumented youth known as "Dreamers" in the United States, and the detention of undocumented immigrants with no criminal history, among other issues.

"The meeting was very worrying," a source told the Univision News source at the closed-door Capitol meeting. "Secretary Kelly does not seem to learn from his mistakes and insists on implementing President Donald Trump's massive deportation agenda, no matter how much damage it does to the nation," he added.

The meeting was planned by the caucus to address a long list of "concerns", including confirmation of a national deportation mechanism promised by President Donald Trump during his campaign.

The source added that "we did not expect much from Secretary Kelly at this meeting. But we were surprised how they talked about the future of immigrants, both dreamers and other people who make up the 11 million-strong undocumented community."

Access to journalists was not allowed at the meeting.

The Hispanic Caucus is also concerned about the increase in arrests of undocumented immigrants with no criminal history, and warned that "the migratory battles ahead in Congress will be essential to protect the welfare of the immigrant community, especially the Latino community."

"Now more than ever we need the Democrats not to shake hands with this government," the source said.

**Prepared for the worst**

For Democratic congressman Luis Gutiérrez (Illinois), the outcome of the meeting with Secretary Kelly is summed up in a simple phrase: "We must prepare for the worst."

"I think we have to prepare to fight mass deportation," he said. "We show up at airports to fight against the ban on Muslims and refugees, and now DREAMers and people who have legally lived here for decades with TPS (Temporary Protected Status) are in imminent danger."

Gutierrez noted that Secretary Kelly "basically told us that he does not know if he will extend the benefit that protects thousands of Central Americans from deportation," and that the future of the

nearly 800,000 undocumented youth, known as dreamers and beneficiaries of the DACA program, Corresponds to Attorney General Jeff Sessions, the United States' top advocate against immigration. "

"Kelly basically said that DACA is facing a death sentence. They (the Trump government) really want to turn millions of people who are documented into undocumented, and then go after them and their families," said Congressman for Illinois.

### Scheduled topics

The meeting touched on issues such as the increase in the number of immigrants detained by Immigration and Customs Enforcement (ICE) agents who have no criminal record, the increase in the numbers of the national deportation force promised by President Donald Trump during his campaign, and the future of the dreamers.

"We are concerned about the announcement that the government will persecute parents and relatives of single asylum seekers to accuse them of human trafficking, and the future of TPS (Temporary Protection Status) for thousands of Central American immigrants who have spent time in the United States and their deportation, "the Hispanic Caucus press office told Univision News earlier.

About 300,000 undocumented migrants from El Salvador, Honduras and Nicaragua have been protected since 1999 from deportation through a Temporary Protection Status that also allows them to work in the US.

At the beginning of his campaign, Trump said he would deport the estimated 11 million undocumented immigrants in the United States, but later changed his speech and said that he would only expel those with a criminal record, and that he would seek a permanent solution for the Dreamers.

But by the end of June, 10 Texas-led states issued an ultimatum on Sept. 5 to have Attorney General Jeff Sessions cancel DACA. Otherwise, they warned, they will demand action before the same court that in 2015 stopped the implementation of DAPA (which protects from the deportation of parents of citizens and legal residents) and the extension of DACA.

Had they been implemented, these programs would have slowed down the deportation of just over 5 million undocumented parents of legal citizens and residents and dreamers who did not qualify for DACA because they are over 30 years of age as of June 15, 2012.

### Trump's Policy

Immigration arrests by ICE increased following two immigration enforcement actions signed by Trump on January 25: one related to the construction of the wall on the Mexican border and another to sanctuary cities.

In both actions Trump decreed that undocumented immigration constitutes a threat to public and national security and ordered the activation in the country of Section 287g of the Immigration Act, which allows DHS to make agreements with local police to act as Immigration agents in the arrest of undocumented immigrants.

With this measure, Trump would have a national deportation force that would target the 11 million undocumented individuals in the country.

Last week a DHS internal memo was released in which the director of the ICE deportation unit ordered its 5,700 officers to stop all undocumented people from crossing their path, regardless of whether they committed crimes or are being sought out for a deportation order.

The meeting was held within the framework of the House of Representatives' debate on the 2018 DHS budget, which includes a $ 1.6 billion provision for the construction of the wall on the Mexican border, one of Trump's major anti-immigrant policies.

LINK

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

June 15, 2017

MEMORANDUM FOR:     Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Joseph B. Maher
Acting General Counsel

Michael T. Dougherty
Assistant Secretary for Border, Immigration, and Trade Policy

FROM:     John F. Kelly

SUBJECT:     Rescission of November 20, 2014 Memorandum Providing for
Deferred Action for Parents of Americans and Lawful Permanent
Residents ("DAPA")

On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing
Public Safety in the Interior of the United States." In that Order, the President directed federal
agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable
aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued
an implementing memorandum, stating that "the Department no longer will exempt classes or
categories of removable aliens from potential enforcement," except as provided in the
Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood
Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred
Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2].  After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3]  The June 15, 2012 DACA memorandum, however, will remain in effect.

## Background

The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."  This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria:  (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate."  The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas.  In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).  The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion.  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time.  I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3

**Rescission of November 20, 2014 DAPA Memorandum**

       I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities.  After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

Page 0277

Withheld pursuant to exemption

(b)(6)

of the Freedom of Information and Privacy Act

Page 0278

Withheld pursuant to exemption

(b)(6)

of the Freedom of Information and Privacy Act

Page 0279

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0280

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0281

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0282

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0283

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0284

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0285

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0286

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0287

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0288

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0289

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0290

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0291

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0292

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0293

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0294

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0295

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0296

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



| From: | Wonnenberg, David (b)(6) |
| | (b)(6) (b)(6) (b)(6) |
| To: | "Phillips, James M (b)(6) |
| | (b)(6) (b)(6) (b)(6) >"; |
| | "Cassidy, Ben <(b)(6) |
| | (b)(6) (b)(6) "; |
| | "Corbin, Susan (b)(6) |
| | (b)(6) (b)(6) "; |
| | "Dinh, Uyen (b)(6) |
| | (b)(6) (b)(6) "; |
| | (b)(6) (b)(6) |
| | (b)(6) (b)(6) } |
| | (b)(6) (b)(6) |
| | (b)(6) (b) (b)(6) " |
| Subject: | RE: POLITICO  Trump has decided to end DACA, with 6-month delay |
| Date: | 2017/09/03 21:26:08 |
| Priority: | Normal |
| Type: | Note |

DACA legislation possible in any of these must-pass Sept bills? Dec w/ omnibus? Too ambitious?

V/r,

David Wonnenberg

Deputy Assistant Secretary

DHS Ofc of Legislative Affairs



(b)(6)

With honor and integrity, we will safeguard the American people, our homeland, and our values.

---

**From:** Phillips, James M

**Sent:** Sunday, September 03, 2017 9:10:26 PM

**To:** Cassidy, Ben; Corbin, Susan; Wonnenberg, David; Dinh, Uyen; (b)(6)

**Subject:** POLITICO Trump has decided to end DACA, with 6-month delay

POLITICO

BREAKING NEWS: Trump has decided to end DACA, with 6-month delay

Originally published: 09/03/17 08:21 PM EDT

President Donald Trump has decided to end the Obama-era program that grants work permits to undocumented immigrants who arrived in the country as children, according to two sources familiar with his thinking. Senior White House aides huddled Sunday afternoon
to discuss the rollout of a decision likely to ignite a political firestorm — and fulfill one of the president's core campaign promises.

Trump has wrestled for months with whether to do away with the Deferred Action for Childhood Arrivals, known as DACA. He has faced strong warnings from members of his own party not to scrap the program and struggled with his own misgivings about targeting minors
for deportation.

Conversations with Attorney General Jeff Sessions, who argued that Congress — rather than the executive branch — is responsible for writing immigration law, helped persuade the president to terminate the program, the two sources said, though White House aides caution that — as with everything in the Trump White House — nothing is set in stone until an official announcement has been made.

In a nod to reservations held by many lawmakers, the White House plans to delay the enforcement of the president's decision for six months, giving Congress a window to act, according to one White House official. But a senior White House aide said that chief of staff John Kelly, who has been running the West Wing policy process on the issue, "thinks Congress should've gotten its act together a lot longer ago."

Trump is expected to announce his decision on Tuesday, and the White House informed House Speaker Paul Ryan of the president's decision on Sunday morning, according to a source close to the administration. Ryan had said during a radio interview on Friday that he didn't think the president should terminate DACA, and that Congress should act on the issue.

Neither the White House not a spokesman for Ryan immediately responded to requests for comment.

The president's expected announcement is likely to shore up his base, which rallied behind his broader campaign message about the importance of enforcing the country's immigration laws and securing the border. At the same time, the president's decision is likely
to be one of the most contentious of his early administration, opposed by leaders of both parties and by the political establishment more broadly.

The White House and Congress have tried to pass the issue off on each other – with each arguing that the other is responsible for determining the fate of the approximately 800,000 undocumented immigrants who are benefiting from DACA. Though most Republicans
believe that rolling back DACA is a solid legal decision, they are conscious of the difficult emotional terrain. Utah Sen. Orrin Hatch joined Ryan in cautioning Trump against rolling back the program.

The president is likely to couch his decision in legalese. Many on the right, even those who support protections for children brought into the country illegally through no fault of their own, argue that DACA is unconstitutional because former President Barack Obama carried it out unilaterally instead of working through Congress.

Some Republican lawmakers, including Florida Sen. Marco Rubio, have said that Congress needs to pass a law to protect the so-called Dreamers.

"My hope is that as part of this process we can work on a way to deal with this issue and solve it through legislation, which is the right way to do it and the constitutional way to do it," Rubio told CNN in June.

Trump's expected decision to scrap DACA represents another CHALLENGE for Ryan and fellow congressional Republicans, who are facing an end-of-September deadline to avert a government shutdown and government debt default, while also tackling a Hurricane Harvey
relief package and a major tax reform push.

READ MORE ON POLITICO.COM

Download the POLITICO app for your iPhone, iPad, or Android device

Follow POLITICO on Twitter: @POLITICO

Disclaimer: Please note that POLITICO is not responsible for the content within this email. POLITICO cannot verify the sender of this email.



| | |
|---|---|
| **Sender:** | Wonnenberg, David (b)(6) |
| | (b)(6) |
| **Recipient:** | "Phillips, James M (b)(6) |
| | (b)(6) |
| | "Cassidy, Ben (b)(6) |
| | (b)(6) |
| | "Corbin, Susan (b)(6) |
| | "Dinh, Uyen (b)(6) |
| | (b)(6) |
| | (b)(6) |
| **Sent Date:** | 2017/09/03 21:26:07 |
| **Delivered Date:** | 2017/09/03 21:26:08 |



| | |
|---|---|
| **From:** | Dinh, Uyen < (b)(6) > |
| **To:** | "Phillips, James M (b)(6) (b)(6) "; "Cassidy, Ben (b)(6) (b)(6) "; "Corbin, Susan < (b)(6) (b)(6) "; "Wonnenberg, David (b)(6) (b)(6) "; (b)(6) (b)(6) "; (b)(6) (b)(6) "; (b)(6) (b)(6) " |
| **Subject:** | RE: POLITICO  Trump has decided to end DACA, with 6-month delay |
| **Date:** | 2017/09/03 21:37:03 |
| **Priority:** | Normal |
| **Type:** | Note |

It was just a matter of time before this news would be leaked.

_____

From: Phillips, James M

Sent: Sunday, September 03, 2017 9:10:26 PM

To: Cassidy, Ben; Corbin, Susan; Wonnenberg, David; Dinh, Uyen; (b)(6)

Subject: POLITICO  Trump has decided to end DACA, with 6-month delay

POLITICO

BREAKING NEWS: Trump has decided to end DACA, with 6-month delay

Originally published: 09/03/17 08:21 PM EDT

President Donald Trump has decided to end the Obama-era program that grants work permits to undocumented immigrants who arrived in the country as children, according to two sources familiar with his thinking. Senior White House aides huddled Sunday afternoon to discuss the rollout of a decision likely to ignite a political firestorm — and fulfill one of the president's core campaign promises.

Trump has wrestled for months with whether to do away with the Deferred Action for Childhood Arrivals, known as DACA. He has faced strong warnings from members of his own party not to scrap the program and struggled with his own misgivings about targeting minors for deportation.

Conversations with Attorney General Jeff Sessions, who argued that Congress — rather than the executive branch — is responsible for writing immigration law, helped persuade the president to terminate the program, the two sources said, though White House aides caution that — as with everything in the Trump White House — nothing is set in stone until an official announcement has been made.

In a nod to reservations held by many lawmakers, the White House plans to delay the enforcement of the president's decision for six months, giving Congress a window to act, according to one White House official. But a senior White House aide said that chief of staff John Kelly, who has been running the West Wing policy process on the issue, "thinks Congress should've gotten its act together a lot longer ago."

Trump is expected to announce his decision on Tuesday, and the White House informed House Speaker Paul Ryan of the president's decision on Sunday morning, according to a source close to the administration. Ryan had said during a radio interview on Friday that he didn't think the president should terminate DACA, and that Congress should act on the issue.

Neither the White House not a spokesman for Ryan immediately responded to requests for comment.

The president's expected announcement is likely to shore up his base, which rallied behind his broader campaign message about the importance of enforcing the country's immigration laws and securing the border. At the same time, the president's decision is likely to be one of the most contentious of his early administration, opposed by leaders of both parties and by the political establishment more broadly.

The White House and Congress have tried to pass the issue off on each other – with each arguing that the other is responsible for determining the fate of the approximately 800,000 undocumented immigrants who are benefiting from DACA. Though most Republicans believe that rolling back DACA is a solid legal decision, they are conscious of the difficult emotional terrain. Utah Sen. Orrin Hatch joined Ryan in

cautioning Trump against rolling back the program.

The president is likely to couch his decision in legalese. Many on the right, even those who support protections for children brought into the country illegally through no fault of their own, argue that DACA is unconstitutional because former President Barack Obama carried it out unilaterally instead of working through Congress.

Some Republican lawmakers, including Florida Sen. Marco Rubio, have said that Congress needs to pass a law to protect the so-called Dreamers.

"My hope is that as part of this process we can work on a way to deal with this issue and solve it through legislation, which is the right way to do it and the constitutional way to do it," Rubio told CNN in June.

Trump's expected decision to scrap DACA represents another CHALLENGE for Ryan and fellow congressional Republicans, who are facing an end-of-September deadline to avert a government shutdown and government debt default, while also tackling a Hurricane Harvey relief package and a major tax reform push.

READ MORE ON POLITICO.COM

Download the POLITICO app for your iPhone, iPad, or Android device

Follow POLITICO on Twitter: @POLITICO

Disclaimer: Please note that POLITICO is not responsible for the content within this email. POLITICO cannot verify the sender of this email.

**Sender:** Dinh, Uyen (b)(6)



| | |
|---|---|
| **Recipient:** | (b)(6)<br>"Phillips, James M" (b)(6)<br>(b)(6)<br>"Cassidy, Ben" (b)(6)<br>(b)(6)<br>"Corbin, Susan" (b)(6)<br>(b)(6)<br>"Wonnenberg, David" (b)(6)<br>(b)(6)<br>(b)(6)<br>(b)(6) |
| **Sent Date:** | 2017/09/03 21:37:02 |
| **Delivered Date:** | 2017/09/03 21:37:03 |

Page 0306

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0307

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0308

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0309

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0310

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0311

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0312

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0313

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0314

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0315

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0316

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0317

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0318

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0319

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0320

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0321

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act



| From: | Lapan, David < (b)(6) |
|---|---|
| | (b)(6)    (b)(6)    (b)(6) |
| To: | "Cassidy, Ben (b)(6) |
| | (b)(6)    (b)(6)    "; |
| | "Corbin, Susan (b)(6) |
| | (b)(6)    (b)(6)    "; |
| | "Harper, Jerald (b)(6) |
| | (b)(6)    (b)(6)    , |
| | "Hoffman, Jonathan (b)(6) |
| | (b)(6)    (b)(6)    "; |
| | "Neumann, Elizabeth |
| | (b)(6)    (b)(6)    "; |
| | "Nielsen, Kirstjen < (b)(6) |
| | (b)(6)    (b)(6)    >" |
| Subject: | DACA stories |
| Date: | 2017/07/12 16:18:19 |
| Priority: | Normal |
| Type: | Note |

Stories thus far –

# DHS chief has doubts about legality of immigration program

**By KEVIN FREKING** Associated Press

July 12, 2017 — 3:10pm

WASHINGTON — Homeland Security Secretary John Kelly has told Hispanic lawmakers that a program that protects young immigrants from deportation is likely illegal, though he is personally supportive.

Kelly had attended a closed-door meeting Wednesday with members of the Congressional Hispanic Caucus.

They pressed him on former President Barack Obama's Deferred Actions for Childhood Arrival Program. DACA gives hundreds of thousands of young people brought into the country as children a work permit and protection from deportation.

Members of the Congressional Hispanic Caucus pushed Kelly for an update on whether the administration would defend the program. They are coming away from the meeting concerned. Trump pledged as a candidate to "immediately end" the DACA program. But as president, he has said that class of immigrants will not be targets for deportation.

# Trump admin to lawmakers: DACA in jeopardy

*Washington (CNN)* The DACA program, which protects undocumented immigrants brought to the US as children, could be in serious jeopardy, President Donald Trump's secretary of Homeland Security told lawmakers Wednesday.

Secretary John Kelly told Democrats of the Congressional Hispanic Caucus that while he personally supports the program, he could not commit to the Trump administration defending it, according to members in attendance and Kelly's spokesman, David Lapan.

Kelly said that legal experts he's talked to both inside and outside the administration have convinced him that it is unlikely the DACA program, the Obama administration's Deferred Action for Childhood Arrivals executive action, would sustain a court challenge.

Kelly said he has discussed DACA with Attorney General Jeff Sessions but wouldn't describe the contents of those conversations. Sessions is an immigration hard-liner who has been outspoken against the Obama administration policy.

"He did not indicate that they would (defend it). He didn't say that they wouldn't, but he didn't say that they would," said New Jersey Democratic Sen. Bob Menendez. "So between that and what he says is the legal analysis he's heard, it's not a pretty picture."

The issue may be forced later this year. There is a pending lawsuit on a related program, deferred action for parents of childhood arrivals, that will come up in September, and attorneys general from 10 states are threatening to add DACA to their complaints, which could force the administration to defend or abandon it.

Kelly suggested to lawmakers they work to pass immigration reform, but lawmakers expressed frustration that Kelly seemed to ignore the difficulty of passing legislation and the Republican opposition to extending DACA. They were also unhappy he seemed unaware there were any bills to make the program permanent, including the bipartisan BRIDGE Act and other proposals including from some Republicans -- "to which there was a combination of laughter and appalled shock in the room," said California Rep. Nanette Barragán.

The Democrats pressed Kelly to make his support for DACA more vigorous, suggesting he stand alongside them for a news conference as he did with Republican leadership when the House passed two bills cracking down on immigration enforcement. Kelly indicated he would consider doing so, but didn't commit.

"His urging is that Congress do something," Arizona Rep. Ruben Gallego said. "Our urging is: Don't be a fool. If you truly believe and Donald Trump believes that you should protect DACA, then the government should join and encourage the protection of DACA and fight against his attorney general."

"If you're going to count on Jeff Sessions to save DACA, then DACA is ended," Illinois Rep. Luis Gutiérrez said.

Trump himself pledged to "immediately" rescind DACA on the campaign trail, but after his election spoke about the difficulty of the issue for him as many of the recipients are honorable and contributing members of communities. The administration has continued issuing DACA permits under the program, angering many on the right who had hoped Trump would hold true to his pledge to end it.

**From:** Lapan, David
**Sent:** Wednesday, July 12, 2017 2:55 PM
**To:** Ben Cassidy (b)(6)                                        ; Susan Corbin
(b)(6)                                         ; Harper, Jerald
(b)(6)                      ; OPA ((b)(6)
(b)(6)                      ; Neumann, Elizabeth <(b)(6)                      ;
**Subject:** FW: URGENT! Secretary Kelly´s meeting with CHC today, clarification please

See below.

Also, based on the questions I received from reporters afterward, and the interviews members conducted after leaving the room (during the meeting), these were the major issues, and ones for which we'll likely see several press stories –

DACA – does the Secretary support it; will he attend a press conference (some of the members asked him to attend press conferences in support of DACA and the Bridge Act) to defend/support it; did the Secretary say DACA would be killed the courts?
TPS – what will he do on TPS for the CENTAM countries; what about Haiti?
Deportations/interior enforcement

Also, I got question about POTUS Tweet on border crossings down 75%

Note: When pressed about supporting DACA legislation, S1 asked if there is any current DACA legislation, and was told there are several, including the Bridge Act (sponsored by Graham, Durbin and five others on the Senate side, Coffman and seven others in the House).  Members mentioned to the press S1 not knowing about DACA legislation because reporters asked me about it.

**From:** Lapan, David
**Sent:** Wednesday, July 12, 2017 2:30 PM
**To:** N(b)(6)      (b)(6)                        ; Burke, Jennifer (b)(6)                    >; Media
Inquiry (b)(6)
**Subject:** RE: URGENT! Secretary Kelly´s meeting with CHC today, clarification please

That is not accurate. He did say DACA could be challenged in the courts in Sept. and that most attorneys believe it won't withstand a legal test. He said he doesn't know what the US government position on DACA will be.

On TPS, he said he didn't know what to do about TPS for the Central American countries. On TPS for Haiti, he explained that the conditions in the country that created the TPS designation, the earthquake, have largely been resolved – not necessarily the overall conditions in the country but the ones that led to TPS for Haiti.  But he didn't say what his decision will be on TPS for Haiti.

Dave

**From:** Maria Pena [mailto (b)(6)
**Sent:** Wednesday, July 12, 2017 2:19 PM
**To:** Lapan, David <(b)(6)                >; Burke, Jennifer <(b)(6)                ; Media Inquiry

(b)(6)

**Subject:** URGENT! Secretary Kelly´s meeting with CHC today, clarification please

Some CHC members are saying that their take away from the meeting is that Kelly warned them that TPS and DACA could face a death sentence as early as September if USDOJ chooses not to defend DACA in a pending lawsuit, or something to that effect.
Can you send me a readout or the gist of what Secretary Kelly´s message was to the CHC?
I don´t want to run with just what the CHC is saying.

Thanks.

--

María Peña
Washington Correspondent
La Opinión/ Impremedia

(b)(6)

www.impremedia.com

(b)(6)



| | | |
|---|---|---|
| **Sender:** | Lapan, David (b)(6) (b)(6) | (b)(6) (b)(6) |
| **Recipient:** | "Cassidy, Ben (b)(6) (/(b)(6) )/ | (b)(6) "; |
| | "Corbin, Susan (b)(6) (/(b)(6) )/ | (b)(6) ". |
| | "Harper, Jerald (b)(6) (/(b)(6) )/ | (b)(6) |
| | "Hoffman, Jonathan (b)(6) | (b)(6) "; |
| | "Neumann, Elizabeth (/(b)(6) )/ | (b)(6) "; |
| | "Nielsen, Kirstjen (b)(6) (b)(6) | (b)(6) " |
| **Sent Date:** | 2017/07/12 16:18:18 | |
| **Delivered Date:** | 2017/07/12 16:18:19 | |

FOR OFFICIAL USE ONLY

**PHONE CALL WITH SENATOR THOM TILLIS (R-NC)**
**SENATE COMMITTEE ON THE JUDICIARY**
**SEPTEMBER 5, 2017 @ 2:00PM EDT**

**Contact Number:** Scheduler (b)(6)           will connect (b)(6)

**PURPOSE:**
- This call is an opportunity to articulate the Administration's cancellation of the Deferred Action for Childhood Arrivals (DACA) program.

**BACKGROUND:**
- Senator Tillis has expressed concerns about abruptly terminating DACA, particularly as regards the impact on the labor market, and wants to be a leader in solving this problem.
- He is working on legislation similar to that introduced by Congressman Curbelo (R-FL) called *Recognizing American Children (RAC) Act* which would bar the removal of Dreamers and certain qualifying aliens. This bill would offer an eventual path to U.S. citizenship for immigrants who entered illegally before Jan. 1, 2012, and were 16 years old or younger. The Senator believes his effort can be a strong conservative approach.
- Additionally, Tillis' proposal would grant high school graduates without a serious criminal record conditional immigration status for a five-year period. During that time, if they earn a higher-education degree, serve in the military or stay employed, they could apply for permanent residency and, eventually, citizenship.

**DISCUSSION POINTS:**
- On September 5, the Administration canceled the June 15, 2012 memorandum that created the program known as Deferred Action for Childhood Arrivals ("DACA").

- The President was given two stark options.  He could allow the program to be challenged in court and risk having it struck down in a sudden, disruptive manner, or wind the program down in an orderly manner that ensured that no current beneficiary would be impacted for a minimum of six months while Congress looks for a proper legislative solution.

- President Trump and I appreciate what Dreamers bring to the diversity and economy of our nation but we are a nation of laws and DACA is not a legal program as it was not legislated by Congress.  Only Congress has the authority to create and amend our immigration laws.

- While no new applications will be accepted effective immediately, no current DACA beneficiaries will be impacted by the Attorney General's decision before March 5, 2018. This should allow Congress sufficient time to develop a legislative solution to this issue – something I understand that you are attempting to address.

- Administration is working on its core principles for legislation it would like to see. DHS believes a strong enforcement element remains key.

**Participants:**
Acting Secretary Elaine Duke

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Ben Cassidy, Assistant Secretary, Office of Legislative Affairs

Page 0328

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0329

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0330

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0331

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0332

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0333

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0334

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0335

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0336

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0337

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0338

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0339

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0340

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0341

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0342

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0343

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0344

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act

Page 0345

Withheld pursuant to exemption

(b)(5)

of the Freedom of Information and Privacy Act